STATE EX REL. MARTIN, Attorney General, Plaintiff,
vs. HEIL, Governor, and another, Defendants.

*December 21—December 29, 1942.*

44

The *Attorney General* and *James Ward Rector,* deputy attorney general, for the plaintiff.

For the defendant Julius P. Heil there were briefs by *Miller, Mack & Fairchild,* and oral argument by *J. Gilbert Hardgrove* and *Paul R. Newcomb,* all of Milwaukee.

*James J. Kerwin* of Milwaukee, attorney, and *Daniel H. Grady* of Portage and *Edwin J. Gross* of Milwaukee of counsel, for the defendant Walter S. Goodland.

Briefs *amici curiæ* were filed by *Walter D. Corrigan, Sr.,* and *Thomas M. Corrigan,* both of Milwaukee; by *Fisher, Reinholdt & Peickert* of Stevens Point, and *M. M. Morrissey* and *Everett C. Holterman,* both of Madison; by *Joseph E. Messerschmidt* of Madison; by *William J. Morgan* and *Berthold J. Berkwich,* both of Milwaukee; by *Wm. B. Rubin* of Milwaukee; by *Stanley W. Slagg* of Edgerton; by *W. H. Stafford* of Milwaukee; and by *William J. Zimmers* of Milwaukee.

WICKHEM, J. The facts of this case are not in dispute and are thus set forth in the complaint: Julius P. Heil was elected governor on November 5, 1940, for a term beginning the first Monday in January, 1941. He duly qualified for the office and has since been, and is now, the duly elected and qualified governor. Walter S. Goodland, at the same election, was elected to the office of lieutenant governor, qualified for the office, and is now the duly elected and qualified lieutenant governor. On November 3, 1942, Orland S. Loomis was elected to the office of governor to succeed Julius P. Heil and a certificate of election issued and delivered to him. At the same election, Walter S. Goodland was elected to succeed himself in the office of lieutenant governor, a certificate of election was issued to him, and on December 9, 1942, he filed his oath of office as lieutenant governor for the term beginning the first Monday in January, 1943. Orland S. Loomis died on December 7, 1942, not having taken the oath of office as governor, but having, however, on November 30, 1942, entered upon his duties as governor-elect by holding budget hearings as provided by sec. 15.08, Stats. Upon his death, Walter S. Goodland undertook to conduct such budget hearings on December 11, 1942, continuing throughout that day, but has not subsequently held such hearings.

Upon these facts, the questions heretofore referred to have arisen. It needs no argument to demonstrate that an early determination of these questions is of the utmost importance to the people of the state of Wisconsin in order that the government of the state may function in a valid and orderly manner.

Broadly speaking, the questions presented are whether the present incumbent, Julius P. Heil, holds over for the whole or any part of the term for which Orland S. Loomis was elected; whether, if he does, he holds over only until such time as by special election a successor to Orland S. Loomis can be elected; whether, if Julius P. Heil does not hold over as governor for

any part of the ensuing term, he may appoint a successor, either to hold for the term or until a special election be called to select a successor to Orland S. Loomis; whether, on the other hand, Walter S. Goodland as the duly elected lieutenant governor, on the first Monday of January, 1943, by virtue of applicable constitutional provisions, will succeed to the powers, duties, and functions of governor for the whole of the term for which Orland S. Loomis was elected. The questions have been stated factually, in order to present at the outset, the results of the various contentions of the parties.

An understanding of the questions presented may be promoted by setting forth the provisions of the constitution and statutes material to a consideration of these questions.

Sec. 1, art. V, Const., provides:

"The executive power shall be vested in a governor, who shall hold his office for two years; a lieutenant governor shall be elected at the same time, and for the same term."

Sec. 7, art. V, Const., provides:

"In case of the impeachment of the governor, or his removal from office, death, inability from mental or physical disease, resignation, or absence from the state, the powers and duties of the office shall devolve upon the lieutenant governor for the residue of the term or until the governor, absent or impeached, shall have returned, or the disability shall cease. . . ."

Sec. 8, art. V, Const., provides:

". . . If, during a vacancy in the office of governor, the lieutenant governor shall be impeached, displaced, resign, die, or from mental or physical disease become incapable of performing the duties of his office, or be absent from the state, the secretary of state shall act as governor until the vacancy shall be filled or the disability shall cease."

Sec. 10, art. XIII, Const., provides:

"The legislature may declare the cases in which any office shall be deemed vacant, and also the manner of filling the

vacancy, where no provision is made for that purpose in this constitution."

Sec. 17.03, Stats., is entitled "Vacancies, how caused." Sub. (9) of this section provides that a public office becomes vacant upon—

"The death or declination in writing of any person elected or appointed to fill a vacancy or for a full term before he qualifies, or his death or such declination before the time when, by law, he should enter upon the duties of his office to which he was elected or appointed."

Sec. 7.01, Stats., is entitled "Elections to fill vacancies." Sub. (2) provides for special elections to fill vacancies in the office of United States senator or representatives in the congress of the United States. Sub. (3) provides for special elections to fill vacancies in the office of state senator or assemblyman. Sub. (4) provides:

"A vacancy in any other elective state office (except that of governor or lieutenant governor), if it occurs more than six months before the expiration of the current term, may be filled at a special election held not later than sixty days before the next general election."

Sec. 17.19 (4), Stats., provides:

"In the office of secretary of state, treasurer, attorney general or state superintendent, by appointment by the governor, and a person so appointed shall hold office until his successor is elected, as provided in section 7.01, and qualifies, but if no such election is held, the person so appointed shall hold office for the residue of the unexpired term."

Sec. 17.27, Stats., is entitled "Vacancies in other offices; how filled" and sub. (4) provides:

"In case of a vacancy in any office in the state where no other provision is made for filling the same, it shall be filled by appointment by the governor."

As the questions agreed upon by counsel are framed, the first is whether the present incumbent holds over beyond the expiration of his present term until his successor is elected and qualified. With the exception of one brief *amicus curiæ* it is conceded in all briefs which urge that a successor to Mr. Loomis may be selected by special election, that there must be a holding over by the incumbent or a devolution of the powers of that office for a portion of the term upon the lieutenant governor, in order to avoid the probability of a situation in which for a time there would be no governor or any person empowered to discharge his functions. This is true because it would be difficult in any event to conduct a special election after November in time for the successor to qualify by the first Monday of January, next. It would, of course, be quite impossible to do so if the death occurred just before the time when the governor-elect was to qualify. It is inconceivable, in view of the time, care, and effort put upon the subject of succession by the constitutional convention that such an hiatus was left unprovided for. If the governor holds over, the possibility of a special election to take care of the office for a portion of the ensuing term may be considered. If he does not, it is impossible to find any constitutional ground for a conclusion that the office is to be vacant in function and fact until filled by special election. We are of the view that the constitution does not authorize the incumbent of the office of governor to hold over under any circumstances, beyond the term for which he was elected. The constitutional provision is not that the governor shall hold for a period of two years and until his successor shall be elected and qualified. The provision is that the governor shall hold for a term of two years. The absence of words extending the term until such time as a successor has been duly elected and qualified is, of course, not wholly conclusive and as pointed out in *State ex rel. Pluntz v. Johnson*, 176 Wis. 107, 184 N. W. 683, 186 N. W. 729, there has been a tendency in the authorities to

hold, in spite of the absence of these words, that an incumbent holds over until his successor is selected and qualified. In the *Pluntz Case,* which is cited as authority for the proposition that the present incumbent holds over beyond his term, this court upon rehearing and after a contrary ruling had been vigorously defended in the original opinion, held that an elective sheriff holds over until his successor is elected and qualified, although the applicable constitutional provision did not specifically so extend the term. The court grounded its conclusions upon the tendencies of the authorities, upon practical construction, and upon the inconvenience and annoyance which would result from suspension of official functions, if no person was authorized to act as sheriff.

We are strongly of the view that the opinion has no bearing upon this case. The *Pluntz Case, supra,* construed sec. 4, art. VI, of the constitution. This section deals with the time and manner of election of sheriffs, coroners, registers of deeds, district attorneys, and all other county officers, except judicial officers. As originally enacted, the section provided that sheriffs should be elected once every two years and as often as "vacancies shall happen." It will be noted that sec. 4, art. VI, Const., never has specifically defined the term of a sheriff, the extent of the term being implied from the fact that a sheriff was elected every two years. See *State ex rel. Knutson v. Johnson,* 171 Wis. 521, 177 N. W. 899. In 1882 the section was amended to provide that all vacancies should be filled by appointment, and that the person appointed "shall hold only for the unexpired portion of the term to which he shall be appointed and until his successor shall be elected and qualified." To conclude that an elective sheriff did not hold over until his successor was elected and qualified would not only create a complete vacancy in that office until the successor qualified, with all the resulting disorder and inconvenience, but a wholly irrational distinction between an appointive and an elective sheriff. In none of the offices

dealt with in sec. 4, art. VI, Const., does the constitution provide for substitutes or in any way take care of the discharge of official functions during such a period.

When to the practical construction found by the court to have existed from the time the constitution was adopted was added that furnished by the amendment of 1882, itself, the court found it possible, although not without great difficulty, to conclude that elective and appointive sheriffs were intended by the constitution to have the same term. The constitutional provision with respect to the governor presents quite a different problem. The language is not merely that a governor shall be elected every two years as in the case of a sheriff, but that his term shall be two years. There is no such aid to a liberal construction of sec. 1, art. V, Const., as was furnished by the 1882 amendment to art. VI. Further than this, the governor is the executive head of the state—the holder of a political office of the first importance. The report of the constitutional convention indicates that the members of that convention were greatly concerned and gave profound consideration to every aspect of the office of governor. There was, for example, vigorous advocacy of a one-year term and a limit to the number of successive terms he could serve. The debates evidence to a considerable degree that distrust of the executive which belongs to the period of the Revolution and the years following it. Elaborate precautions were taken to provide as completely as possible, for his term and the contingencies of his inability to serve, and we cannot believe that it was the purpose of the constitution to permit an incumbent to hold over at all. Even if the holding over was merely until a successor could be chosen, such a governor would discharge many of the most important functions of the office during the period of his holding over. While this is especially true now, because the biennial session of the legislature commences shortly after the governor's inauguration, the difference at the time of the adoption of the constitu-

tion was only one of degree. There is every reason in the case of a great political office like that of governor for giving to the constitutional term of two years its literal significance. There is, on the other hand, little practical objection in an administrative office to permitting a sheriff or clerk of court to give continuity to the administration of his office by continuing until a successor is elected and qualified. While the *Pluntz Case, supra,* states that the tendency of the authorities is in the direction of liberal construction, we have discovered no case in which such a construction was applied to the office of governor. We are of the view that under the constitution the present governor does not hold over beyond the term of office for which he was elected.

The next question is whether, assuming that the governor does not hold over, there will, after the fourth of January, 1943, be a vacancy in the office of governor, and if there is such a vacancy, how the same is to be filled. We deem it convenient at this point to consider the proper construction of sec. 7, art. V, Const., since this is one of the two sections making express provision for the discharge of the functions of the office of governor in case of the inability of the governor to act. In this connection we express our strong conviction that sec. 7, art. V, Const., either devolves the powers and duties of governor upon the lieutenant governor for the complete term in such a situation as is here presented, or it does not impose them upon him at all. The language of sec. 7 is open to no other construction. It is suggested in one of the briefs that the office remains vacant, although the functions devolve upon the lieutenant governor, and that since the office remains vacant, steps may be taken to fill this vacancy by special election. While the premise is true and was expressly sustained in *State ex rel. Martin v. Ekern,* 228 Wis. 645, 280 N. W. 393, the difficulty with the conclusion is that the vacancy specified by sec. 7 is completely provided for by sec. 7 itself, thus leaving no room for the

operation of sec. 10, art. XIII, Const., which permits the legislature to provide the manner in which vacancies shall be filled where the constitution contains no provision for that purpose. It is contended by counsel for incumbent that the terms of sec. 7 plainly and unambiguously refer to the disability of a governor who has actually qualified. It is strongly argued that the term "residue" implies that only a part of the term remained to be served when the disability occurred. It is argued from this that the constitution in sec. 7 has only taken care of a situation in which a qualified governor, by reason of the circumstances detailed, has become unable to serve the rest of his term, and that the situation in which a governor has wholly failed to qualify is unprovided for. It would follow from this that by authority of sec. 10, art. XIII, Const., the legislature may define the vacancy and prescribe the manner of filling it. The legislature, having in sec. 17.03 (9), Stats., included in the definition of a vacancy the death or declination before he qualified of a person elected to office, the situation is claimed to be one which must be dealt with by special election or appointment in accordance with statutory provisions applicable to such situations. The first question to be answered is whether the language of sec. 7 so clearly and unambiguously supports the position of counsel for the incumbent that it is not open to construction. It is our conclusion that it does not. The use of the word "governor" in sec. 7 does not unambiguously exclude "governor-elect." The term "governor-elect" is a merely statutory designation, and not a constitutional word. There is no reason, so far as rules having to do with the use of language generally are concerned, why the term "governor" may not include "governor-elect" for a particular term, and it is a particular term that the constitution deals with in sec. 7. Webster's dictionary defines governor as "the person elected as chief executive official of a state in the United States. . . ." It requires no more interpolation to hold that the term "gov-

ernor" includes "governor-elect" than it does to limit it to "qualified and acting" governor. We see no reason why the word "governor" as used in sec. 7 may not reasonably be taken to include an elected governor who has not qualified.

A more formidable difficulty is presented by the word "residue." It is asserted that this term usually has the meaning of "rest" or "remainder" and unambiguously implies that a part of the term will always have elapsed when the disability occurs and that it inevitably follows that a qualified governor must have occupied the office for the elapsed portion. This would be quite persuasive if we failed to consider the peculiar purpose for which the term "residue" was used in sec. 7. It plainly deals, not with the beginning, but with the termination of the devolution of the governor's powers upon the lieutenant governor. Its purpose is to indicate that unless the governor, absent or impeached, "shall have returned, or the disability shall cease" the lieutenant governor is to hold *until the end of the term.* The lieutenant governor clearly takes over the functions of the office upon the happening of the disability. Since the word "residue" is clearly used to establish the period of the lieutenant governor's devolved powers, the implication that he acts to fill out a partially expired term is much weakened—if not destroyed. The word "residue" so used is correctly applied to the whole of a term, as well as to a part. Two constitutional provisions of other states illustrate the points made. In the constitution of West Virginia, the provisions corresponding to sec. 7 are as follows:

"In case of the death, conviction on impeachment, *failure to qualify,* resignation, or other disability of *the governor,* the president of the senate shall act as governor."

Here it will be noticed that failure to qualify is one of the specified contingencies, and the word "governor," where first used, clearly applies to governor-elect. The Nebraska constitution provides that in case of the death, impeachment, and

notice thereof to the accused, *failure to qualify,* resignation, absence from the state or other disability of the *governor,* the powers, duties, and emoluments of the office for the residue of the term, or until the disability shall be removed, shall devolve upon the lieutenant governor. Here, as in the West Virginia provision, failure to qualify is specifically made one of the contingencies upon which the lieutenant governor is to exercise the powers and duties of governor. In the Nebraska constitution the term "governor" includes "governor-elect" and "residue" is applicable to the whole of the term as well as to a part.

A further objection may briefly be referred to. A listing of the contingencies upon which the powers and duties of the office of governor shall devolve upon the lieutenant governor include two that probably cannot apply to a governor who has not qualified. Those are impeachment and removal from office. However, this does not mean that the rest of the contingencies, to wit : Death, inability from mental or physical disease, resignation or absence from the state, cannot as well apply to a governor-elect as to a fully qualified governor. The fact that some of the specified contingencies can only apply to a governor who has qualified imports no such limitation into contingencies which are capable of applying to a governor-elect. The provisions of sec. 8 of art. V of the constitution bear importantly upon the construction of sec. 7. It is there provided that if *during a vacancy* in the office of governor, the lieutenant governor shall be impeached, displaced, resign, etc., the secretary of state shall act as governor until the vacancy shall be filled, or the disability shall cease. It apparently deals with the contingencies provided for by sec. 7, assumes that the lieutenant governor acts as governor during a *vacancy in that office,* and implies that sec. 7 merely contains a general description of a vacancy in the office of governor. This would be important since the failure of a governor to qualify is within the general definition of "va-

cancy." See in this connection, *State ex rel. Martin v. Ekern*, 228 Wis. 645, 280 N. W. 393. Some ambiguity is created in sec. 8 by the statement that the secretary of state shall act as governor *until the vacancy shall be filled* or the disability shall cease, but it is arguable that the words "vacancy shall be filled" relate to the return of an absent governor in contrast with one who has been impeached but who has removed his disability. We have sought to do no more in our analysis of sec. 7 than to demonstrate that the language of that section may reasonably be construed to provide for devolution of the powers of the governor upon the lieutenant governor where the former has never qualified. It is, of course, arguable that the language was not intended to cover that situation and the section is not wholly free from ambiguity. It is extremely important in the interpretation of constitutional provisions that we avoid determinations based purely on technical or verbal argument and that we seek to discover the true spirit and intent of the provisions examined. We must not fail to give effect to plain and completely unambiguous language in the constitution, but where there is a reasonable ground to differ concerning the sense in which language is used, the provision should be examined in its setting in order to find out, if possible, the real meaning and substantial purpose of those who adopted it.

In view of the foregoing, consideration should be given to the debates and proceedings of the constitutional convention itself. The committee on the executive, legislative, and administrative, comprising seven members, reported to the convention on December 21, 1847, provisions identical with those now constituting art. V of the constitution. There was a vigorous debate on the question whether there was any necessity for providing for the office of lieutenant governor. It was at first voted to amend sec. 7 by striking out all reference to a lieutenant governor and imposing his duties upon the president of the senate. In the course of the debate upon

this amendment the contingencies named in sec. 7 were attacked as too remote to warrant the expense of providing a lieutenant governor. The proponents of the section denied the remoteness and asserted that it was highly improper and opposed to the genius of our institutions to substitute for the lieutenant governor a legislative officer of the senate who had never been voted upon by the people as a whole. They contended that the people should elect a governor, lieutenant governor, and secretary of state, "thereby providing for all contingencies which could arise." Ultimately, the convention reconsidered its action after further debate and voted to retain sec. 7 in the present form. In the course of the second debate one of the objectors to the creation of the office of lieutenant governor stated that the latter was at best, a mere minuteman—an officer without duties, save as president of the senate. He saw no good reason why these duties could not as well be performed by a president of that body, duly elected by its members; and *in case of vacancy in the office of governor* providing that the secretary of the territory should issue a proclamation for an election to fill the vacancy provided an incumbent was deemed necessary. In opposition to this, one of the delegates stated that while he did not feel strongly about the matter, a contingency might occur in which his services might be highly necessary and he was in favor of providing for all contingencies that might occur and therefore on the whole, he was in favor of having such an officer. "Wisconsin Historical Collections," "The Attainment of Statehood," Quaife, volume XXIX, p. 268. Sec. 7, art. V, Const., was adopted and has never since been amended.

It appears quite clearly that the provisions of the New York constitution of 1846 were available and used by the delegates to our constitutional convention. The corresponding section of the New York constitution of 1821 was identical with sec. 7 as ultimately adopted in this state, except that the words "inability from mental or physical disease" did not

occur in the New York constitution of 1821. The corresponding section of the New York constitution of 1846 as ultimately adopted, was identical with sec. 7 of the Wisconsin constitution, except that it substituted "inability to discharge the powers and duties of the said office" for the reference to mental or physical disease. It is interesting, however, to note that the proposed section as originally presented to the New York convention of 1846 is identical with sec. 7, except that the Wisconsin version substitutes the words "shall have returned" for "shall return" and omits the word "all" before the words "the military force."

In the light of this similarity, it is significant that the debates took almost precisely the same course in New York as they did in Wisconsin. Throughout the debates in New York, the defenders of the provision for the office of lieutenant governor constantly recur to the need in case of the death or inability of the governor for "someone to fill his place"—"to take upon himself the office of governor in case of vacancy"— and stressed these considerations as the sole substantial reasons for having a lieutenant governor at all. The fact that at least a portion of the draft of the New York constitution was before the delegates of the Wisconsin convention is stated in *Attorney General ex rel. Schantz v. Brunst,* 3 Wis. *787. It is evident to us that both the draft and the debates of the New York constitution were known to the delegates to the Wisconsin convention and that our convention copied and adopted a proposed draft of the matter covered by sec. 7, including a portion later deleted there.

We conclude that there is not the slightest evidence in the proceedings of the constitutional convention of any intention to make a distinction between the case of a duly elected governor who, by reason of death or some other circumstance, has failed to qualify, and that of one who has qualified and later has become disabled to act. The carefully prescribed succession without adverting to this distinction is, standing

alone, a strong circumstance indicating that no such distinction was intended to be preserved. To suppose, in the absence of language clearly compelling that conclusion, that there was an intended·distinction as to vacancy and devolution of power between the case of a governor who died the day before he qualified, and one who died the day after that event, seems wholly unreasonable in view of the fact that the only purpose asserted in the Wisconsin and New York constitutions for having a lieutenant governor was to insure that in all contingencies the functions of the office of governor would be discharged without interruption. That the foregoing was the practical construction of sec. 7 by the legislature is evidenced by the fact that there has been no legislative effort to deal with the situation at all. The office of governor is excepted from elaborate provisions for special elections to fill vacancies and no specific provisions for filling vacancies in the office of governor have ever been enacted. This is not an accidental omission. The legislature never supposed it had any duties to perform with respect to vacancies in the office of governor. It may be answered that the office of lieutenant governor is also excepted from provisions for special election, and that we held in *State ex rel. Martin v. Ekern, supra,* that this made operative sec. 17.27 (4), Stats., providing for filling the office by appointment. In that case, however, there was concededly a vacancy, and no constitutional provision for filling it. There was no ambiguity of construction which would warrant resort to practical construction. We have found no case directly in point. The North Dakota case of *State v. Moodie,* 65 N. D. 340, 258 N. W. 558, goes much further than our conclusions here. Upon identical constitutional provisions, it was held that the lieutenant governor had the duties of governor devolved upon him in a case where by reason of nonresidence the governor lacked the qualifications for office, and the election was completely void. Several cases take a contrary view. *Carr v.*

*Wilson,* 32 W. Va. 419, 3 L. R. A. 64; *State ex rel. Thayer v. Boyd,* 31 Neb. 682, 48 N. W. 739, 51 N. W. 602. These cases appear to us not to be in point for the reason that in none of them was a governor considered to have been elected at all. For example, in the *Carr Case,* the constitution of West Virginia specifies failure to qualify as one of the contingencies upon which the powers of the governor devolved upon the lieutenant governor. This case, nevertheless, held that where no governor was ever elected, the situation was not within the contingencies of the devolution clause, which in respects other than above noted was substantially identical with sec. 7.

We conclude that with respect to the office of governor, the constitution takes care of every contingency involving a duly elected governor, except one in which the governor, lieutenant governor, and secretary of state are all unable to function, a contingency evidently considered so remote as not to call for specific mention. Viewing the provision of sec. 7 in the light of the constitutional history of the office of lieutenant governor, and of the practical construction by the legislature, we are of the view that on the first Monday of January, 1943, the powers and duties of the office of governor will devolve upon Walter S. Goodland, the duly elected lieutenant governor, for the entire term for which Mr. Loomis was elected. The language of sec. 7 readily accommodates itself to this construction and the construction conforms to the general constitutional purpose providing for succession as well as the reasons for the creation of the office of lieutenant governor as these appear from the debates of the constitutional convention. It is something more than a makeweight that this conclusion obviates many practical difficulties which any other construction would raise. It avoids the holding over of a governor, either *de jure* or *de facto;* it invests with the powers and duties of governor, a person who at the same election as that in which the deceased governor-elect prevailed, was deliberately chosen by the people for no other important

purpose than to substitute for the governor; it avoids an interregnum and the expense of a special election which could in most cases furnish a substitute only for the least important portion of the ensuing term.

We have not heretofore discussed the proposition that the incumbent may, in the circumstances, appoint a successor. The contention calls for no extended discussion. It fails in view of our conclusion as to the proper construction of sec. 7, of art. V, Const. It would fail in any event, under the doctrine of *State v. Roden*, 219 Wis. 132, 262 N. W. 629, since such an appointment would be for a vacancy not arising during the incumbency of the present governor.

The foregoing disposes of all questions submitted by the parties and so importantly affecting the interests of the people of this state as to warrant the exercise of original jurisdiction.

We take this occasion to acknowledge the substantial help given by the able briefs filed by the parties, as well as those filed *amicus curiæ*. We commend the correct and public-spirited attitude of the governor, lieutenant governor, secretary of state, and attorney general, whose high-minded efforts to promote the orderly processes of government by a decision in this case evidence fidelity to their duties as citizens and public officers in a democracy.

*By the Court.*—It is held:

(1) That the present incumbent of the office of governor does not hold over beyond the expiration of his present term;

(2) That on and after the 4th day of January, 1943, there will be a vacancy in the office of governor;

(3) That the vacancy in the office of governor on January 4, 1943, results in the devolution of the powers and duties of the office upon the lieutenant governor for the residue of the term, that is, for the term ending on the first Monday in January, 1945;

(4) That because, as indicated in (3), the constitution devolves the duties of the office upon the lieutenant governor, a special election cannot be called to fill the vacancy;

(5) That for the reasons stated in (3), and because of the doctrine of *State v. Roden,* 219 Wis. 132, 262 N. W. 629, the present incumbent has no authority to fill by appointment a vacancy in the office of governor.

BARLOW, J., took no part.