69 So.2d 187 (1953)
STATE ex rel. AYRES
v.
GRAY et al.
Supreme Court of Florida. En Banc.
December 11, 1953.
*188 Willard Ayres, Ocala, for relator.
*189 Richard W. Ervin, Atty. Gen., Howard S. Dailey, Asst. Atty. Gen., and John D. Moriarty, Sp. Asst. Atty. Gen., for R.A. Gray.
J. Lewis Hall, Tallahassee, for Brailey Odham.
Ben C. Willis and Charles S. Ausley, Tallahassee, for LeRoy Collins.
Marion Sibley, Miami Beach, and W.G. Ward, Miami, amici curiae.
THOMAS and MATHEWS, Justices.
Willard Ayres, as a citizen and taxpayer of the State of Florida, presented to this Court, 23 November 1953, a petition for extraordinary relief which had for its eventual purpose the determination of the question whether elections should be held in 1954 for the choice of a nominee and the election of a Governor to serve the remainder of the term of the late Dan McCarty, Governor of Florida, who died 28 September 1953. In the prayer the relator sought "the advice of this Court in the premises," the issuance of a writ of quo warranto against both the Secretary of State and Brailey Odham, who had already qualified as a candidate for the office, and the issuance of an alternative writ of mandamus directing the Secretary of State "to show cause why he should not expunge from the records and files of his office the receipt, oath and election reports" of the candidate.
When this petition was examined by the members of the Court, they were skeptical about the jurisdiction of the Court to entertain the petition and about the right of the relator to maintain the proceedings. Consequently, the six members of the Court participating unanimously ordered, 23 November 1953, that these two questions would first be determined and in the event the Court decided that it should exercise its jurisdiction, and that the relator had the right to maintain the proceedings, the application would be heard on its merits.
The matter was set for argument 30 November 1953 on the first two propositions. After the argument, the Court unanimously decided that the relator could not seek the advice of the Court, that being a prerogative only of the Governor within the narrow channel set out in Section 13 of Article IV of the Constitution, and that no ground appeared in the petition for the issuance of a writ of quo warranto. So consideration was focused on the right of the relator to a writ of mandamus directed to the Secretary of State.
The Court concluded that the relator, as a citizen and taxpayer, could invoke the process of the Court, largely because of the status given a candidate for election under Chapter 99, Florida Statutes 1951, and F.S.A. To qualify under this law as a candidate for Governor, one must take the prescribed oath and an oath of loyalty to the United States and the State of Florida. He must also as a condition precedent to becoming a fully qualified candidate for Governor, appoint a campaign treasurer and *190 designate a campaign depository and file their names and addresses with the Secretary of State. The law carries elaborate provisions regulating the receipt of contributions and the expenditure of funds, and a requirement that detailed reports of these receipts and expenditures be filed weekly with the Secretary of State.
It is inherent in the law that once a person qualifies for the office of Governor, he may go forth, with the apparent sanction of the State through the Secretary of State, to gather funds to further his candidacy, without any restriction whatever as to the total amount, although there are prohibitions against contributions by persons engaged in certain pursuits, and a limitation on the amount that may be donated by any one individual.
After earnest consideration of the status thus attained under the law by a candidate for the office of Governor, the Court came to the conclusion that a citizen and taxpayer could file an action in mandamus which would have the effect of testing the authority of the Secretary of State to qualify and establish a person as a candidate for the office of Governor. This conclusion was reached by each member of the Court, all participating.
Of course, unless there will be need for an election there is no occasion for the State, personified by the Secretary of State, to establish a man as a candidate for an office and thereby give him, subject to the restrictions we have enumerated, the apparent authority to go about the State of Florida and gather funds from all who are disposed to contribute.
To state it otherwise, if such an election is not one properly to be held, the offices of the Secretary of State should not be devoted to qualifying the candidates as well as keeping the complex records that would follow the qualification of the candidates.
Much has been said to us, in opposition to the issuance of a writ, about the right of an individual to make this challenge, but once the conclusion is reached that the proposed candidate has acquired with the sanction of the Secretary of State the preeminent status to which we have referred, we think there is abundant law to support the position that a citizen and taxpayer may seek the remedy and that the door of the Court should not be closed to him simply because he acted alone.
In 1880 this Court recognized the distinction between writs of mandamus to enforce private rights and those to coerce the performance of acts of a general public nature. In the case of State of Florida ex rel. Scott v. Board of County Commissioners of Jefferson County, 17 Fla. 707, the Court quoted with approval from the decision in People v. Halsey, 37 N.Y. 344, as follows:
"`The writ of mandamus may, in a proper case, and in the absence of an adequate remedy by action, issue on the relation of a private individual, to redress a wrong personal to himself, or, on the relation of one who, in common with all other citizens, is interested in having some act done, of a general public nature, devolving as a duty upon a public officer or body who refuses to perform it.' * * * `Inasmuch as the people themselves are the plaintiff in a proceeding by mandamus, it is not of vital importance who the relator should be so long as he does not officiously intermeddle in a matter with which he has no concern.'"
The same rule is found in High's Extraordinary Legal Remedies (1896), Sec. 431, where it is announced that when relief is sought to protect private rights the relator must show a special interest in the subject matter since his right must clearly appear, but when a public right is involved and the purpose of the action is the enforcement of a public duty the people are the real parties and the relator need not have a personal interest, "it being sufficient to show that he is a citizen and as such interested in the execution of the laws."
The matter was considered in 1893 in the case of Florida Cent. & P.R. Co. v. State ex rel. Mayor, etc., of Town of Tavares, 31 *191 Fla. 482, 13 So. 103, 20 L.R.A. 419. There the principle was again recognized on the authority of McConihe v. State of Florida, ex rel. McMurray, 1879, 17 Fla. 238, where Section 431 of High's Extraordinary Legal Remedies was cited as authority.
In 1942 the distinction was reiterated in Board of Public Instruction of Dade County v. State ex rel. Hunter, 150 Fla. 213, 7 So.2d 105, where we quoted with approval the statement already given from High's Extraordinary Legal Remedies. Then, in Florida Industrial Commission v. State ex rel. Orange State Oil Company, 155 Fla. 772, 21 So.2d 599, decided in 1945, the Court repeated the statement relative to the right of a citizen to have the law executed by writ of mandamus even though he had no special interest in the result.
So it is clear that as early as 1879 and as late as 1945 this Court recognized and applied the rule which we now consider governing in the circumstances of this case so far as the aloneness of the petitioner is concerned. Incidentally, the institution of the suit by relator as an individual without expressly stating that he represented all persons in his situation is inconsequential because, as we said in Board of Public Instruction of Dade County v. State ex rel. Hunter, supra, "This is quite evident" from the allegations of the petition.
This Court is always chary of assuming original jurisdiction in cases of mandamus. By Rule No. 30(d) it is expressly provided that "Original petitions in mandamus will not be entertained * * * unless a state officer, state board, state functionary, or some other agency authorized to represent the public generally is named as respondent." Exercise of jurisdiction in the instant case clearly would not violate the rule as the Secretary of State is the principal party.
In the case of Newberry v. Harris, 114 Fla. 379, 153 So. 901, the Court declined original jurisdiction because it was not apparent that "any new or novel question [was] raised or presented" or any "grave question of general law * * *." Here the problem is obviously new and novel and one of immense public interest for the solution of it will eventually determine who will serve as chief executive of the State for a period of two years.
The procedure of accomplishing by mandamus a decision of the prime question has been challenged as a substitution for injunction because commanding a deletion resulting in a discontinuance instead of preventing a continuance of certain actions by the Secretary of State, but we think the decision of this Court in State ex rel. Taylor v. Gray, 157 Fla. 229, 25 So.2d 492, is abundant authority for a determination of this point in relator's favor.
In recapitulation,  the stature of a candidate for the office of Governor created by the present election laws, and the involvement of the office of Secretary of State, coupled with the immense public interest in the basic question of the need, or needlessness, of elections, convinced this Court that jurisdiction should be assumed by mandamus and that the issues implicit in the litigation were of the character entitling a lone citizen and taxpayer to apply for the writ. State ex rel. Watson v. Lee, 150 Fla. 496, 8 So.2d 19.
The relator was entitled to seek the writ. Although he was not entitled as a matter of right to secure what he sought, we decided, after careful study of the situation, to exercise our discretion in his favor so that the doubt, confusion, and uncertainty existing in the minds, not only of electors but also of candidates and prospective candidates, would be dispelled.
The Court, therefore, issued an alternative writ commanding the Secretary of State to strike from the records of his office all papers filed and entries made establishing and qualifying Brailey Odham as a candidate for the office of Governor in 1954 or to show cause for failing to do so.
The Secretary of State immediately moved to quash the alternative writ and *192 now that full argument has been heard on the motion there is squarely presented the question of the necessity of elections in 1954 to choose a Governor to serve from the first Tuesday after the first Monday in 1955 to the first Tuesday after the first Monday in 1957.
The questions presented involve fundamental principles of our Constitutional system of government. They are of such importance that we deem it advisable to set forth the reasons for our conclusion with clarity, certainty and definiteness so that in the future there will be no room for confusion, question or doubt.
Honorable Dan McCarty was elected Governor of Florida at the General Election in 1952 for a four-year term to begin on the first Tuesday after the first Monday in January, 1953, and to continue for a period of four years, ending on the first Tuesday after the first Monday in January, 1957. The Honorable Charley E. Johns was President of the Senate and by reason of the self-executing provisions of Section 19, Article IV of the State Constitution, the powers and duties of Governor devolved upon him.
It is now claimed by the petitioner-relator that the Honorable Charley E. Johns is not the Acting Governor, but is the Governor of the State of Florida; that there is no vacancy in the office of Governor; that he will continue to be the Governor of the State of Florida for the "residue of the term"; that no election is legally permitted or required to fill any part of the term of the late Dan McCarty; and that the provision about an election refers to the Speaker of the House of Representatives, and not the President of the Senate.
Specific sections of the Constitution of the State have a bearing upon this question and should be considered in pari materia. They are:
Section 2 of the Declaration of Rights:
"All political power is inherent in the people. * * *"
Section 1, Article III:
"The Legislative authority of this State shall be vested in a Senate and a House of Representatives, * * *."
Section 3, Article III:
"The members of the House of Representatives of the State of Florida shall be chosen biennially, beginning with the general election on the first Tuesday after the first Monday in November, 1898, and thereafter on the corresponding day of every second year."
Sections 1 and 2, Article IV:
"Section 1. The Supreme Executive power of the State shall be vested in a Chief Magistrate, who shall be styled the Governor of Florida.
"Sec. 2. The Governor shall be elected by the qualified electors of the State at the time and places of voting for members of the Legislature, and shall hold his office for four years from the time of his installation, but shall not be eligible for re-election to said office the next succeeding term; Provided, That the first election for Governor under this Constitution shall be had at the time and places of voting for members of the Legislature and State officers, A.D. 1888, and the term of office of the Governor then elected shall begin on the first Tuesday after the first Monday in January after his election." (Emphasis supplied.)
Section 7, Article IV:
"When any office, from any cause, shall become vacant, and no mode is provided by this Constitution or by the laws of the State for filling such vacancy, the Governor shall have the power to fill such vacancy by granting a commission for the unexpired term." (Emphasis supplied.)
Section 19, Article IV:
"In case of the impeachment of the Governor, his removal from office, *193 death, resignation or inability to discharge his official duties, the powers and duties of Governor shall devolve upon the President of the Senate for the residue of the term, or until the disability shall cease; and in case of the impeachment, removal from office, death, resignation or inability of the President of the Senate, the powers and duties of the office shall devolve upon the Speaker of the House of Representatives. But should there be a general election for members of the Legislature during such vacancy, an election for Governor to fill the same shall be had at the same time." (Emphasis supplied.)
Section 7, Article XVIII (as amended in 1944):
"In all cases of election to fill vacancies in office such election shall be for that part of the unexpired term commencing on the first Tuesday after the first Monday in January next after such election."
Section 9, Article XVIII:
"A general election shall be held in each county in this State on the first Tuesday after the first Monday in November, A.D. 1898, and every two years thereafter, for all elective State and county officers whose terms of office are about to expire, or for any elective office that shall have become vacant." (Emphasis supplied.)
The basic principle of our constitutional system is that "All political power is inherent in the people." (Section 2 of the Declaration of Rights.) This inherent power is exercised by the people under a Constitution adopted by them. It provides for the election by the people of most of our officers, including a Governor, members of the Cabinet, members of the Supreme Court, all members of the Legislature, and for county officers. It guarantees to the people certain rights, and also restrains them in the exercise of their rights and inherent powers to the manner or methods prescribed by law.
The tendency has been, and still is, to extend further the privilege of the people to participate in their government and to elect officers originally appointed, rather than to curtail such participation by the people. There was a time when Circuit Judges and State's Attorneys were appointed by the Governor; United States Senators were elected by the Legislature; and the Governor was authorized to fill vacancies for the entire unexpired term. By reason of amendments to the organic law, United States Senators, Circuit Judges and State's Attorneys are now elected by the people and all vacancies in state and county offices shall be filled only until the next general election, when any elective office which shall have become vacant shall then be filled at such election. All of these provisions of the Constitution emphasize the fact that the framers of the Constitution never intended that a vacancy in the office of Governor should be filled in any other manner than that of an election by the people, and that the powers and duties of the Governor should only be performed by the President of the Senate or the Speaker of the House of Representatives until the next ensuing general election, when the people may exercise their highest prerogative, in electing a Governor to fill the vacancy for "that part of the unexpired term commencing on the first Tuesday after the first Monday in January next after such election." Sections 7 and 9, Article XVIII of the State Constitution.
Prior to the amendment of Section 7 of Article XVIII, a vacancy was filled, as provided for by Section 7, Article IV, by "granting a commission for the unexpired term." (Emphasis supplied.) The amendment of Section 7 of Article XVIII in 1944, had the effect of amending Sections 7 and 19 of Article IV, by limiting the temporary appointment until "the first Tuesday after the first Monday in January next after such election." The effect of one section on the other was settled in the Advisory Opinion *194 to the Governor, Fla., 42 So.2d 170, 172, in which the Justices said:
"You are advised that the Judge of the Criminal Court of Record for Broward County and County Solicitor for said County as created by Chapter 25066, being elective offices under the Constitution, should be filled as provided by Section 6, Article XVIII of the Constitution as amended at the general election in 1944, that is to say, by appointment and commission `only to the first Tuesday after the first Monday in January next after the election and qualification of a successor.' In this case the election and qualification of a successor will take place at the General Election to be held in November 1950. The person elected at said general election should be commissioned for the balance of the term, that is to say, until the first Tuesday after the first Monday in January, 1953."
It is entirely clear that in framing Section 19, Article IV of the Constitution, the people apprehended that, in respect to the office of Governor, two situations might arise and that they intended that Section 19 of Article IV should take care of either situation. They plainly envisioned the possibility that during his term of office the Governor might be temporarily unable to discharge his official duties, because of illness or other debilitating influence. Accordingly, they wrote into Section 19, Article IV of the Constitution, the provision that "In case of the * * * inability [of the Governor] to discharge his official duties, the powers and duties of Governor shall devolve upon the President of the Senate * * * until the disability shall cease * * *." They envisioned, also, the possibility that during his term of office, the office of Governor might become vacant by reason of the impeachment, removal from office, death, or resignation of the incumbent. Accordingly, they wrote into Section 19, Article IV of the Constitution, the provision that "In case of the impeachment of the Governor, his removal from office, death [or] resignation * * * the powers and duties of Governor shall devolve upon the President of the Senate for the residue of the term * * *." The words "for the residue of the term" were definitely limited by the following sentence: "But should there be a general election for members of the Legislature during such vacancy, an election for Governor to fill the same shall be had at the same time." (Emphasis supplied.)
Only by so construing Section 19, Article IV of the Constitution, can each word, phrase, clause and sentence of the section be given its full meaning and effect.
Under Section 19, Article IV, in the case of death, "the powers and duties of Governor shall devolve upon the President of the Senate for the residue of the term," and in case of the death of the President of the Senate, the "powers and duties of the office [of Governor] shall devolve upon the Speaker of the House of Representatives." The office of Governor does not devolve upon the President of the Senate or the Speaker of the House of Representatives, but only the "powers and duties". The fact that the President of the Senate became Acting Governor and not Governor was decided in our Advisory Opinion to Acting Governor Johns, Fla., 67 So.2d 413, 414, wherein he asked the following question:
"3. In signing official documents and acts, should I sign the same as Governor, as Acting Governor, or in some other form? If in some other form, please advise me the form in which I should sign."
and we gave the following reply:
"In response to your question three, you are advised that under Section 19, Article IV, of the Constitution of Florida, the powers and duties of Governor have devolved upon you by virtue of the death of Governor Dan T. McCarty and it is our opinion that, when performing such executive duties, you are authorized to designate yourself as Acting Governor, by virtue of Section 19, Article IV of the Constitution."
*195 The above quoted answer is reaffirmed and adopted as a part of the opinion in this case.
The last sentence of Section 19, Article IV, reads: "But should there be a general election for members of the Legislature during such vacancy, an election for Governor to fill the same shall be had at the same time." This sentence contains a constitutional declaration that there is a "vacancy" which was caused by the death of the Governor who was elected for a four-year term as required by Section 2 of Article IV of the State Constitution, and for an election to fill such vacancy. The sentence relates to the vacancy in the office of Governor, whether the powers and duties have devolved upon the President of the Senate or the Speaker of the House of Representatives.
Some of the provisions of Section 19, Article IV of the Constitution, are self-executing. A vacancy in the office of Governor is entirely different from a vacancy in any other office. As to vacancies in other offices, the Constitution authorizes the Governor to make temporary appointments. The framers of the Constitution recognized that upon the death of the Governor there would be no one left to make a temporary appointment of someone to perform the duties and powers of Governor. Therefore, this section of the Constitution stands in place and in lieu of the Governor, and of itself makes the temporary appointment and provides that the powers and duties of the office shall devolve upon a member of the Senate; namely, the President of the Senate. This is a self-executing provision and operates of its own force, and without the intervention of any appointing power.
By virtue of the self-executing provisions of the Constitution, the "powers and duties" of the Governor "devolve" upon the President of the Senate, or, in the event of his death, etc., upon the Speaker of the House of Representatives for the "residue of the term". The words "residue of the term", as stated before, are limited by what follows. In the event there should be a general election for members of the Legislature during such vacancy (in the office of Governor), an election for Governor to fill the same shall be held at such election, without regard to whether the President of the Senate or the Speaker of the House of Representatives, as Acting Governor, is performing the powers and duties of the office of Governor. The words "for the residue of the term" can be given the meaning contended for by the petitioner-relator only when there is no general election for members of the Legislature during such vacancy.
It appears from the record that there is a vacancy in the office of the Governor of Florida, and during such vacancy a general election for members of the Legislature will be held.
The following cases from other jurisdictions have been cited: State ex rel. Roberts v. Olcott, 94 Or. 633, 187 P. 286; State ex rel. Lamey v. Mitchell, 97 Mont. 252, 34 P.2d 369; State ex rel. Martin v. Heil, 242 Wis. 41, 7 N.W.2d 375; State ex rel. Murphy v. McBride, 29 Wash. 335, 70 P. 25.
We have carefully examined each of the above mentioned cases. They are with reference to constitutions of other states, which are different from the Constitution of Florida. Not one of them contains a requirement such as that set forth in our Constitution that "should there be a general election for members of the Legislature during such vacancy, an election for Governor to fill the same [such vacancy] shall be had at the same time." (Emphasis supplied.) The cases cited are not applicable to the question before us.
It was asserted at the bar of the Court during oral argument by one of counsel presenting the views of petitioner-relator that he had carefully read the notes of the Constitutional Convention of 1885 and did not find anything which would suggest the reason for the change in the Constitution of 1868, as amended, and the provisions of the Constitution of 1885, now under consideration. This left the very definite impression that the notes of the Constitutional Convention *196 of 1885 made no reference to these matters. On the contrary, we have examined the Journal of the Proceedings of the Constitutional Convention of the State of Florida, 1885, and find many entries which throw considerable light upon the question now under consideration. Pages 102, 106 through 111, 114 and 118 through 121 of the Journal, supra, show preliminary consideration of the sections of Article V (now Article IV), with reference to the Executive Department. When Section 19 was reached Mr. Paterson offered an amendment providing for a Lieutenant-Governor which was not agreed to.
On page 121 of the Journal, supra, we find the following entry:
"Mr. Yonge offered the following amendment and moved its adoption:
"After the word Representatives in the 6th line, insert the following: `And when the President of the Senate or the Speaker of the House shall be called to discharge the duties of Governor, he shall cease to be a member of the Senate or House, as the case may be:'
"Which was not agreed to.
"Section 19 was declared adopted as reported by the committee." (Emphasis supplied.)
It appears that when an effort was made to insert in the Constitution the provision that when the President of the Senate or the Speaker of the House should be called upon to discharge the duties of Governor, he "shall cease to be a member of the Senate or House, as the case may be", it was not agreed to.
In the consideration of Section 6 of Article IV (now Section 6 of Article III), with reference to the Legislative Department of the government, we find the following entry on page 151 of the Journal, supra:
"Mr. Miller offered the following amendment:
"Add after the word `Senate,' in second line of Section 6, the words `who shall, in the event of the death, impeachment or disqualification of the Governor, became Governor;'
"Which was withdrawn."
We thus find an entry showing a proposed amendment which, if adopted, would have provided for the President of the Senate to "become Governor" in the event of the death, impeachment or disqualification of the Governor. This entry shows a clear intent that the President of the Senate was not to become Governor and it also shows an opportunity to have provided for the President of the Senate to "become Governor" if the members of the Convention had so willed.
To those interested in further notes or entries concerning the deliberations of the Constitutional Convention of 1885, we suggest a study of the "Journal of the Proceedings of the Constitutional Convention of the State of Florida, 1885."
It is urged by the petitioner-relator that Sections 14 and 15, Article V, Constitution of 1868, and Section 14, Article V, as amended in 1875, with the repeal of Section 15, Article V, shows that it was never intended by Section 19, Article IV, Constitution of 1885, that the death of the Governor created a vacancy requiring an election, but shows an intent that the President of the Senate serve as Governor for the balance of the unexpired term of the late Dan McCarty. There is no merit in this contention.
Section 14, Article V of the Constitution of 1868, provided for a Lieutenant-Governor as follows:
"Sec. 14. A Lieutenant-Governor shall be elected at the same time and places, and in the same manner as the Governor, whose term of office and eligibility shall also be the same. * * *"
Section 15, Article V, Constitution of 1868, reads:
"Sec. 15. In the case of the * * * death [of the Governor], *197 * * * the power and duties of the office shall devolve upon the Lieutenant-Governor for the residue of the term, * * *."
In 1875 the people adopted Article XIII of the Constitution, which amended Section 14, Article V, and repealed or abrogated Section 15, Article V, of the Constitution of 1868, the pertinent parts of which are as follows:
"Section 14. A Lieutenant-Governor shall be elected at the same time and places and in the same manner as the Governor, whose term of office and eligibility shall also be the same. He shall be the President of the Senate, but shall only have a casting vote therein. In the case of the * * * death * * * the power and duties of the office shall devolve upon the Lieutenant-Governor for the residue of the term, * * *. In case of the impeachment of the Lieutenant-Governor, or his removal from office, death, inability to discharge his official duties, or resignation, the power and duties of the office shall devolve upon the President pro tem. of the Senate. In case a vacancy shall occur both in the offices of the Governor and Lieutenant-Governor, the Legislature, shall at its next session order an election to fill such vacancies. * * *" (Adopted May 4, 1875.) (Emphasis supplied.)
Section 15, Article V, Constitution of 1868, without equivocation or limitation provided that in the event of the death of the Governor, the power and duties should devolve upon the Lieutenant-Governor for the residue of the term. No election was required or provided for, as is now required by Section 19, Article IV, of the Constitution.
When Section 14, Article V, was amended, and Section 15, Article V, was repealed in 1875, it was specifically provided, "In case a vacancy shall occur both in the offices of the Governor and Lieutenant-Governor, the Legislature, shall at its next session order an election to fill such vacancies." (Emphasis supplied.) In other words, Section 14, Article V, as amended, specifically required that there should be a vacancy in both offices, that is, of Governor and of Lieutenant-Governor, before an election should be held to fill such vacancies.
Under the present Constitution, death of the Governor, alone, creates the vacancy, and is the prerequisite for holding an election at the next general election to fill the vacancy for Governor. If the Constitutional Convention of 1885 desired to make the deaths of both the Governor and the President of the Senate a prerequisite to holding an election to fill the vacancy, it could have done so, as was done in the Constitution prior to 1885, which (the Constitution of 1868, as amended) required as a prerequisite to the holding of such an election that a vacancy should occur both in the offices of Governor and Lieutenant-Governor. The absence of such a provision in our present Constitution and the changes made do not support the theory of petitioner-relator, but on the contrary emphasizes the requirement of Section 19, Article IV, that an election must be held to fill the vacancy (declared by the Constitution to exist) in the office of Governor in the event of a general election, during such vacancy, irrespective of the question as to who may be performing the powers and duties of the office.
It is unnecessary that we consider cases from other states to aid us in reaching a conclusion on the issues because the provisions of our Constitution are so plain and unambiguous as to eliminate all questions of doubt. However, similar questions have arisen in Arkansas which were decided in the case of Futrell v. Oldham, 1913, 107 Ark. 386, 155 S.W. 502, 503. The questions presented in that case were so similar to the questions presented in this case and the reasoning of the Supreme Court of Arkansas was so clear and sound that we quote some excerpts from that opinion:
"The present litigation involves a construction of the following provisions of the Constitution of this state:

*198 `Each house, at the beginning of every regular session of the general assembly, and whenever a vacancy may occur, shall elect from its members a presiding officer to be styled, respectively, the president of the senate and the speaker of the house of representatives; and whenever, at the close of any session, it may appear that the term of the member * * * will expire before the next regular session, the senate shall elect another president from those members whose terms of office continue over, who shall qualify and remain president of the senate until his successor may be elected and qualified; and who, in the case of a vacancy in the office of Governor, shall perform the duties and exercise the powers of Governor, as elsewhere herein provided.' Section 17, art. 5.
`In the case of the death, conviction on impeachment, failure to qualify, resignation, absence from the state or other disability of the Governor, the powers, duties and emoluments of the office for the remainder of the term, or until the disability be removed, or a Governor elected and qualified, shall devolve upon and accrue to the president of the senate.' Section 12, art. 6. * * *
"The case turns on the question whether, on the resignation of the Governor, the then incumbent of the office of president of the senate succeeded to the vacated office, or whether merely as such president of the senate the powers, duties, and emoluments of the office of Governor devolved upon him while he remained president.
"* * * The other quoted section provides that the president of the senate, `in the case of a vacancy in the office of Governor, shall perform the duties and exercise the powers of Governor.' Not that the president of the senate shall succeed to the office of Governor; nor that the office itself shall devolve upon him, but merely that he shall exercise the powers and perform the duties of the office during the period of the vacancy, and that the emoluments of the office shall accrue to him during that time. That is to say, he acts as Governor, and receives the emoluments of that office merely by virtue of his office as president of the senate, and does not actually become Governor. The vacancy in the office continues until a Governor is elected by the people, either at a special election called for that purpose or at the next regular election, in the event that the vacancy occurs more than 12 months before the expiration of the term. That could not be so if the office was actually filled by the person who was then president of the senate, for in that event there would be no vacancy, and other words would have been employed by the framers of the Constitution to convey the intended meaning. * * *
"Learned counsel for defendant stress the words, `for the remainder of the term,' used in this section of the Constitution, as indicative of an intention to cast the office itself upon the person who happened to be president of the senate at the time the vacancy occurs. These particular words were, we think, used merely to specify the period during which the duties of the office shall be discharged and the emoluments enjoyed, in case the vacancy occurs within 12 months before the expiration of the term. * * *"
In the case of State ex rel. De Concini v. Garvey, 67 Ariz. 304, 195 P.2d 153, 154, the Constitution provided:
"In case of the impeachment of the governor, or his removal from office, death, inability to discharge the duties of his office, resignation, or absence from the state, the powers and duties of the office shall devolve upon the secretary of state until the disability ceases, or during the remainder of the term."
*199 The Supreme Court of Arizona said:
"The respondent took oath to perform the duties of secretary of state. His duties embrace the responsibility to act as governor in case any of the contingencies provided for in the constitutional provision arise. Walls v. Hall, 202 Ark. 999, 154 S.W.2d 573, 136 A.L.R. 1047.
"We therefore, hold that respondent Garvey is not governor de jure or de facto but merely ex officio or acting governor invested by constitutional mandate with all of the powers and duties of that high office, which devolve upon him by virtue of the fact that he is secretary of state. * * *" (Emphasis supplied.)
The electors of the State have the right to elect a Governor to fill the vacancy in an election, authorized and required by the organic law. This right can only be changed by an amendment in the manner provided for in the Constitution itself. This Court has no power to adopt such an amendment and will not usurp such power under the guise of judicial construction or interpretation.
Under the applicable provisions of our Constitution it is clear that:
(1) There is a vacancy in the office of Governor for the balance of the unexpired four-year term of Governor Dan McCarty.
(2) By reason of this vacancy caused by the death of the Governor, the powers and duties of the office of Governor devolved upon the Honorable Charley E. Johns, President of the Senate, and he shall continue to perform such powers and duties for the unexpired term, unless during the vacancy there should be a general election for members of the Legislature.
(3) There will be a General Election for members of the Legislature in November, 1954, which will be during such vacancy in the office of Governor, and at such General Election, it is mandatory that an election be held to fill the vacancy in the office of Governor for the balance of the unexpired term beginning on the first Tuesday after the first Monday in January, 1955, and ending on the first Tuesday after the first Monday in January, 1957.
(4) The President of the Senate is the Acting Governor, under Section 19 of Article IV of the State Constitution, performing the duties and powers of the Governor until the office is filled as provided for and required by the Constitution.
Any other construction would be in violation of the clear and specific provisions and mandate of the organic law, and of the basic principle of our constitutional system of government that "All political power is inherent in the people", which inherent power must be exercised in the manner or by the method provided for by the Constitution or the law.
Certain duties are imposed upon and vested in the Secretary of State by the primary election laws with reference to the nomination of candidates for political parties to be voted on in the election in November, 1954. The acts of the Secretary of State, as shown by the record in this case, are in the performance of duties imposed upon him by law.
The motion to quash the alternative writ heretofore issued be and the same is hereby granted, and the said alternative writ be and the same is hereby quashed, and the cause dismissed.
ROBERTS, C.J., and TERRELL, SEBRING and DREW, JJ., concur.