74 So.2d 114 (1954)
STATE ex rel. WEST
v.
GRAY et al.
Supreme Court of Florida. En Banc.
February 16, 1954.
*115 J. Frank West, Williston, for relator.
Richard W. Ervin, Atty. Gen., and Howard S. Bailey, Asst. Atty. Gen., for R.A. Gray, Secretary of State, and Francis P. Whitehair, Le Land, and Lawrence A. Truett, Tallahassee, for Charley E. Johns, respondents.
J. Lewis Hall, Tallahassee, for Brailey Odham and Ausley, Collins & Ausley and Messer & Willis, Tallahassee, for LeRoy Collins, amicus curiae.
PER CURIAM.
In original mandamus proceedings filed in this court, we are required to determine the effect of Section 5 of Article III of the Constitution of this state, F.S.A., on the eligibility of the Honorable Charley E. Johns to become a candidate for the office of Governor to fill the unexpired term of the late Governor Dan McCarty. Senator Johns has announced his candidacy for the Democratic nomination for governor and has qualified with the Secretary of State, a respondent here, for such office. The relator seeks to compel the respondent to expunge from his records all matters pertaining to Senator Johns' candidacy. We exercised our discretion in favor of granting the alternative writ in view of the great public interest in the question presented, and the cause is now before the court on motion of the respondent Johns, to quash the alternative writ.
The section of the constitution involved in the present controversy provides that "no Senator or member of the House of Representatives shall during the time for which he was elected, be appointed, or elected to any civil office under the Constitution of this State that has been created, or the emoluments, whereof shall have been increased during such time." Section 5, Article III, Constitution of Florida.
Senator Johns was elected to the Senate at the general election in November 1952 for a four-year term, so that his term of office as Senator will not expire until the general election in 1956. The General Appropriations Bill of 1953, Chapter 28115, F.S.A. § 282.01, carried an appropriation of $15,000 for the salary of the Governor for the biennium ending June 30, 1955. This was an increase of $3,000 per year over the statutory salary of $12,000 per year fixed by Chapter 22913, Laws of Florida, Acts of 1945, F.S.A. §§ 14.04, 111.01, for this office.
The only real question involved in this proceeding is whether the 1953 Appropriations Bill, which provided for an increase in the salary of the office of Governor in the manner noted above, and which, by its own limitation, expires in what would have been approximately the middle of the four-year term of the late Governor McCarty, had he lived, constituted an increase in the emoluments of the office of Governor, within the purview of Section 5 of Article III, supra.
It is a firmly-settled principle of law that in "construing and applying provisions of a Constitution, the leading purpose should be to ascertain and effectuate the intent and the object designed to be accomplished." Mugge v. Warnell Lumber & Veneer Co., 58 Fla. 318, 50 So. 645, 646; State ex rel. Nuveen v. Greer, 88 Fla. 249, 102 So. 739, 37 A.L.R. 1298. And the intention to be ascertained must be that of the framers and the people adopting it, for that intention is the "spirit" of the Constitution. Amos v. Mathews, 99 Fla. 1, 126 So. 308; Sullivan v. City of Tampa, 101 Fla. 298, 134 So. 211; City of Jacksonville v. Continental Can Co., 113 Fla. 168, 151 So. 488; State v. City of Miami, 113 Fla. 280, 152 So. 6; City of Tampa v. Tampa Shipbuilding & Engineering Co., 136 Fla. 216, 186 So. 411; State ex rel. McKay v. Keller, 140 Fla. 346, 191 So. 542; Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892; Story on the Constitution, 5th Ed., Section 400.
In determining intent and purpose of a constitutional provision the courts "should constantly keep in mind the object sought to be accomplished by its adoption, and the evils, if any, sought to be prevented or remedied. Effect should be given to the purpose indicated by a fair interpretation *116 of the language used [but the] intent may be shown by implications as well as by express provisions." 16 C.J.S., Constitutional Law, § 16, pp. 51-54. Amos v. Mathews, supra; Getzen v. Sumter County, 89 Fla. 45, 103 So. 104; State ex rel. Nuveen v. Greer, supra; State ex rel. McKay v. Keller, supra; In re Warner's Estate, 160 Fla. 460, 35 So.2d 296.
The first and fundamental rule in the interpretation of a constitution is to construe it according to the sense of the terms and the intention of the framer of such constitution and the people who adopted it. Where the words are plain and clear and the sense distinct and perfect arising on them, there is generally no necessity to have recourse to other means of interpretation. But where there is some ambiguity or doubt arising from other sources then interpretation has its proper office. "There may be obscurity as to the meaning, from the doubtful character of the words used, from other clauses in the same instrument, or from an incongruity or repugnancy between the words and the apparent intention derived from the whole structure of the instrument or its avowed object. In all such cases interpretation becomes indispensable." Story on the Constitution, 4th Ed., Vol. I, Secs. 400, 401, pp. 305, 306.
Where the words of a constitution, although they express the intention, when they are rightly understood, are themselves of doubtful meaning, recourse must be had to probable or rational conjectures to find out in what sense such words are used. When the words in a constitution admit of two or more senses, each of which is agreeable to common usage, the sense in which they were intended to be used must be collected partly from the words and partly from conjecture as to their intention. In short, the words must be construed "according to the subject matter, in such a sense as to produce a reasonable effect, and with reference to the circumstances of the particular transaction." Ibid., Sec. 402, p. 306.
To accomplish this object, light may be obtained "from contemporary facts or expositions; from antecedent mischiefs, from known habits, manners, and institutions; and from other sources almost innumerable, which may justly affect the judgment in drawing a fit conclusion in the particular case." Ibid.
"Where the words admit of two senses, each of which is conformable to common usage, that sense is to be adopted which, without departing from the literal import of the words, best harmonizes with the nature and objects, the scope and design, of the instrument." Ibid., Sec. 404, p. 308.
All of the authorities are in agreement that such a provision as is involved in this proceeding is inserted in a constitution for the purpose of taking from a senator or a representative "any personal motive which might operate upon him to create a new office or increase the emoluments of any office, new or old." Tucker on the Constitution, Vol. I, p. 442. As the matter is stated by Mr. Justice Story, "The reasons for excluding persons from offices who have been concerned in creating them, or increasing their emoluments, are to take away, as far as possible, any improper bias in the vote of the representative, and to secure to the constituents some solemn pledge of his disinterestedness." Story on the Constitution, 5th Ed., Vol. I, section 867, p. 633. (Emphasis supplied.)
Our own court, speaking through Mr. Justice Terrell in State ex rel. Hawthorne v. Wiseheart, 158 Fla. 267, 28 So.2d 589, 592, has aptly stated that the purpose is "to remove the temptation on the part of the Legislature or any of its members to `featherbed' on the public domain during the period of their election, by raising the salary of or creating public offices and getting themselves appointed thereto."
The expressions of other courts of last resort are also illuminating on the question of the purpose of similar constitutional provisions. Thus, the Mississippi court, in Brady v. West, 50 Miss. 68, says: "This is a wise provision of the constitution, designed as far as possible to preserve the purity of legislation, by putting the sting of *117 disability into the temptation of members of the legislature to create offices of profit with a view to taking and holding them themselves." And the Alabama court, in Montgomery v. State ex rel. Enslen, 107 Ala. 372, 18 So. 157, said: "The evident intention of the framers of the Constitution was to prohibit the legislature from creating offices, or increasing the salary of officers for the possible benefit of any members thereof, and thereby to remove the temptation of prostituting their positions for private gain or preferment." From the Maryland court, in Mayor & Com'rs of Westernport v. Green, 144 Md. 85, 124 A. 403, 404, we have this expression: "It was the obvious intent of the Constitutional provision we have quoted to protect the members of the Legislature from the influence, upon their judgment and conduct, of any personal interest in the creation of new offices or the increase of the salaries or emoluments of any offices. * * * `It will prohibit any person, being a member of either branch of the General Assembly, from legislating * * * in order that he may be benefited by it'". (Emphasis supplied.)
The delegates to the Constitutional Convention of 1885, at which our present constitution was adopted, were quite as well aware then, as we are now, of the problems and temptations which beset our legislators. "The problem to be dealt with was venality. Its dimensions were well known in 1895. It had theretofore often and variously manifested itself in public life. It was not the product of the machine age, the passing of frontiers, or social and industrial developments. It was and is the corrupt product of a quality of human nature confined to no age, class, or race  self-interest." State ex rel. Jugler v. Grover, 102 Utah 41, 125 P.2d 807, at page 822. The authors of our constitution sought to meet this problem by the enactment of the organic provision here involved, as did the framers of the constitutions of 25 other states and the Constitution of the United States. It is noteworthy, however, that only sixteen apply the organic inhibition to elective as well as appointive offices, as does the Florida Constitution. The inhibition of the United States Constitution, Art. I, Sec. 6, Clause 2, extends only to appointive offices. The Florida Constitutions of 1838, 1861, and 1865 expressly excepted from the organic provision "such offices as may be filled by elections by the people." The Constitution of 1868 omitted entirely the organic provision in question.
Why, then, did the framers of our Constitution of 1885 decide to include elective as well as appointive offices within the constitutional inhibition? The minutes of the Constitutional Convention at which it was adopted do not record the discussion which resulted in its adoption in its present form  that is, as applicable to elective as well as to appointive offices. But it is known that, at that time, the people were just emerging from the reconstruction period following the War Between the States; they still bore the scars of the Carpetbag Rule; the memories of the political abuses suffered thereunder were still fresh in their minds; and we can well surmise that they intended to prohibit the "trafficking" in public offices, both elective and appointive, from which they had suffered during that regime.
Public conditions are vastly different today. Many of the offices which were appointive under the original Constitution of 1885 have now, by amendment thereto, been made elective. With the free dissemination of news and the close coverage given the legislative deliberations by press and radio, the people are much better informed concerning the actions of their legislators than they were in 1885, and they can express their approval or disapproval of such actions at the polls. We have no doubt that, as to elective offices, Section 5 of Article III was calculated to, and did, serve a useful purpose in the early days of this state's history; indeed, it still does, within the reasonable limits and for the plain purposes for which it was enacted. But what was then thought to be a shield can, if so strictly interpreted as to enlarge it beyond its purpose, become a sword  a weapon which might easily eliminate capable men from offering for public office, *118 and, in the words of Mr. Justice Story, present "a strong inducement to postpone the creation of necessary offices, lest [members of the legislative body] should become the victims of their high discharge of duty." Story on the Constitution, 5th Ed., Sec. 868, p. 634.
In interpreting constitutional provisions of the type here in question, then, the courts must give a reasonable and common-sense construction to terms used in the light of their relation to the factual situations presented; and such provisions must be "strictly construed to uphold the eligibility of the officer if it can be reasonably done." State ex rel. Fraser v. Gay, 158 Fla. 465, 28 So.2d 901, 904. Such provisions must be interpreted in such a manner as to carry out the intention of the framers of the Constitution and of the people in adopting it, and not to defeat it. For, as stated in a Kentucky decision construing a constitutional provision similar to that here in question, "Words are but imperfect vehicles designed to convey thought and in gathering the thought intended to be conveyed the purpose behind the words should be kept in mind. The Constitution is concerned with substance and not with form and its framers did not intend to forbid a common-sense application of its provisions." Meredith v. Kauffman, 293 Ky. 395, 169 S.W.2d 37, 38. (Emphasis supplied.)
In the case of Meredith v. Kauffman, supra, it appears that a public office was created during a session of the Kentucky legislature of which Kauffman was a member but prior to the time that he was sworn in as such legislator. In refusing to declare Kauffman ineligible to hold the office thus created, the court declared: "Considering the provision in the light of the purpose it was intended to accomplish, it is apparent that it does not render appellee ineligible to the office to which he was appointed. The Act creating the office was passed, enrolled and signed before he was elected to the General Assembly. True, it did not become effective as a law until after his election but the word `created' in the constitutional provision should be construed to have reference in point of time only to the termination of legislative action necessary to creation and not to a future date on which the legislative action becomes effective through operation of law."
The reasonable and common-sense legal approach to the question involved is also illustrated in Mayor & Com'rs of Westernport v. Green, 144 Md. 85, 124 A. 403. Here, one Peters was a member of the General Assembly which passed an Act providing that the Town Clerk of Westernport should be chosen by the mayor and commissioners and that such officers should prescribe the "rate of compensation" for the position. During Peters' term in the General Assembly, the mayor and commissioners increased the salary of Town Clerk and appointed Peters to the office. The court held that there had not been an increase in the emoluments of the office during Peters' term as a legislator, within the meaning of a constitutional provision similar to ours. "The ineligibility to which the Constitution refers in the section cited, was evidently designed to be produced only by action in which the legislators to be affected by the provision could have participated", said the court.
And in State ex rel. Todd v. Reeves, 196 Wash. 145, 82 P.2d 173, 175, 118 A.L.R. 177, it was held that an Act establishing a retirement system for Supreme Court justices  although admittedly adding to the desirability of the office  was not an increase in the emoluments thereof within the organic inhibition; that, as used in the constitution, "emoluments" meant an actual pecuniary gain, rather than "some inponderable and contingent benefit".
In the light of the above rules of construction and bearing in mind the purpose of the organic provision in question, we come, then, to the consideration of the question whether under the facts involved in the instant case Senator Johns should be declared ineligible to hold the office of Governor, because of the provisions of Section 5 of Article III.
*119 As has been noticed, the increase in the salary of the office of Governor was not a permanent fixed increase by statute; it was merely a temporary increase, by appropriation, for the biennium ending June 30, 1955, which by virtue of controlling law will automatically come to an end and the salary will revert to $12,000 on that date. Secs. 14.04 and 111.01, Florida Statutes 1953, F.S.A. It was, from the point of view of the Legislature, a temporary increase in salary for the benefit of the incumbent then in office, and for no one else. At the time of the enactment of the Appropriations Bill, there was no reasonable ground for belief that, by circumstances beyond mortal control, the regular four-year term of Governor McCarty would be brought to an end by his untimely death; and there could not have been present in the mind of any member of the Legislature the remotest thought that by voting the increase for the benefit of the incumbent such legislator would serve or promote any personal ambition he might have to become a candidate for the gubernatorial term beginning in January 1957. And even though the untimely death of Governor McCarty has necessitated an election for Governor two years in advance of the time at which it would ordinarily be held, thereby bringing Senator Johns and all other Senators whose terms of office do not expire until the general election in 1956 within the ban of the constitutional inhibition (if the provision is given a restricted and tortured construction), it is inescapable that no charge of bias or self-interest could possibly be made against any such member, under the circumstances as they existed at the time the Legislature voted for the 1953 General Appropriations Bill.
There is a clear distinction between the facts here present and those in the case of State ex rel. Fraser v. Gay, supra. There, the increase was a statutory increase which, so long as it remained unchanged by another statute, was a fixed and permanent obligation of the state; here, the increase is only a temporary one which, by its very terms, will expire well in advance of what at the time of its enactment was any foreseeable gubernatorial election. There, Senator Fraser had never faced the people in a primary election (he was the Democratic nominee by virtue of an appointment by the State Executive Committee of the Democratic Party), nor did he face the people of this state in a general election in the true sense of the word, as he had no opposition in the general election. Here, Senator Johns will have to run in the primary election against formidable opponents; his candidacy will, in truth and in fact, be submitted to the people. There, Senator Fraser aspired to the office of Comptroller; here, the office involved is that of Governor. This court can take judicial notice of the fact that there is no legal disability against succeeding oneself in the office of Comptroller, as there is in the case of a Governor who holds for a four-year term, and that an election to such an office as Comptroller is often tantamount to a life-time job if the incumbent desires to perform its duties and obligations for that length of time. Thus, the fact that the increase was by statute and was for such an office as Comptroller, assumes even greater importance. It is plain, therefore, that the facts in the instant case are clearly distinguishable from those in the case of State ex rel. Fraser v. Gay, supra.
From what has been said, it is clear that there could have been no temptation on the part of Senator Johns or any other member of the 1953 Legislature "of prostituting their positions for private gain or preferment" in increasing the appropriation for the benefit of the incumbent; they could not have been influenced by "any personal interest" in voting for such increase; they had no "self interest" to serve in voting for it.
For the reasons stated, we are of the opinion that the emoluments of the office of Governor have not been increased by the action of the 1953 session of the Legislature, within the spirit and intent of Section 5, Article III, Constitution of Florida, so that such section does not render Senator Johns ineligible for the office.
*120 The views of the individual justices as reflected in the several opinions filed, have been jointly considered by the court. The Chief Justice and Justices TERRELL, THOMAS, SEBRING, HOBSON and DREW are of the view that the 1953 Legislature increased the salary of the Governor and the various other constitutional officers for the biennium ending June 30, 1955.
Justice MATHEWS is of the view that the Legislature did not increase such salary for the reasons set forth in his opinion. He is also of the view that even if the salary was increased to $15,000 per annum, the action of the Budget Commission in attempting to reduce the salary of this constitutional office to $12,000 was a nullity, and did not reduce the salary of the office. This conclusion is concurred in by Justices SEBRING, THOMAS and TERRELL. The Chief Justice and Justices DREW and HOBSON are of the view that a decision on this question is not pertinent to disposition of the case at bar and therefore do not decide same at this time. Mr. Justices TERRELL, THOMAS, and MATHEWS are of the view that the case of State ex rel. Fraser v. Gay is controlling and the so-called "Gomez Clause" had no effect upon the eligibility of Senator Johns; Mr. Justice MATHEWS holds that the attempted increase in emoluments of the office of Governor failed, and that Senator Charley E. Johns is therefore eligible for the office of Governor which he now seeks by election.
The Chief Justice and Justices SEBRING, HOBSON and DREW are of the opinion that the increase in salary of the Governor provided in the 1953 Appropriations Bill which terminates June 30, 1955 does not render Senator Charley E. Johns ineligible for the office of Governor now being sought by him. Their individual reasons for so holding are set forth in this Per Curiam opinion and in their respective opinions.
The majority of the court composed of Chief Justice, Justices SEBRING, HOBSON, MATHEWS and DREW being of the view that Senator Johns is eligible for the office of Governor for the two-year term beginning in January 1955, the Alternative Writ should be and it is hereby quashed and the cause dismissed.
ROBERTS, C.J., and SEBRING, JJ., concur.
HOBSON and DREW, JJ., concur specially.
MATHEWS, J., concurs in judgment and dissents to opinion.
TERRELL and THOMAS, JJ., dissent.
HOBSON, Justice (concurring specially).
It is well settled that the exercise of the original jurisdiction of this court to grant or withhold extraordinary writs is subject to the use of sound and informed judicial discretion, Somlyo v. Schott, Fla., 45 So.2d 502. Were the law to permit such writs to be made available of right, on the basis of a formalized procedure, their essential character would be lost, and any case which could be fitted, or warped, into the requisite pattern might be placed before us for adjudication as an original proposition. The result would be to forge a Constitutional power incidental to our appellate jurisdiction into an instrument to usurp the prerogatives of the trial courts. Attempts to describe specifically the operation of this principle must fail. It can be ascertained only by a study of multiple decisions, and even precedent must have a more limited application to this than to ordinary fields of law. See Everitt v. Board of County Com'rs Hughes County, 1 S.D. 365, 47 N.W. 296. Thus extraordinary original writs are reserved for extraordinary cases, Newberry v. Harris, 114 Fla. 379, 153 So. 901, but cases they must be. Expediency is no safe or available guide. For sheer want of power, the processes of this court cannot be extended to the solution of abstract legal problems, *121 no matter how perplexing they are or how desirable it may be to find the answer, State ex rel. Crim v. Juvenal, 118 Fla. 487, 159 So. 663; State ex rel. Jackson v. Gray, 125 Fla. 445, 170 So. 137. As the Supreme Court of the United States has said:
"The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property which are actually controverted in the particular case before it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it." People of State of California v. San Pablo & Tulare R. Co., 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747.
In State ex rel. Ayres v. Gray, Fla., 69 So.2d 187, decided December 11, 1953, we were asked to determine whether or not an election for Governor would be held in 1954. I agreed that jurisdiction of that case should be taken because of the certainty and real public importance of the question there presented although I was then apprehensive that the distinction between a case fraught with genuine public interest, as distinguished from private or public curiosity, might not always be fully appreciated and that this court might be flooded with cases such as this in blind reliance upon our decision therein. My decision to take jurisdiction in the Ayres case was supported by State ex rel. Hill v. Cone, 140 Fla. 1, 191 So. 50; State ex rel. Taylor v. Gray, 157 Fla. 229, 25 So.2d 492; State ex rel. Davis v. Atlantic Coast Line R. Co., 95 Fla. 14, 116 So. 48, certiorari denied 281 U.S. 727, 50 S.Ct. 245, 74 L.Ed. 1144; State ex rel. Fleming v. Crawford, 28 Fla. 441, 10 So. 118, 14 L.R.A. 253; Florida Industrial Commission v. State, 155 Fla. 772, 21 So.2d 599; Baker v. State, 159 Fla. 286, 31 So.2d 275; Board of Public Instruction of Dade Co. v. State, 150 Fla. 213, 7 So.2d 105; Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963; State ex rel. Sunday v. Richards, 50 Fla. 284, 39 So. 152; and Fla. Cent. & P.R. Co. v. State, 31 Fla. 482, 13 So. 103, 20 L.R.A. 419. And see State ex rel. Andrews v. Gray, 125 Fla. 1, 169 So. 501. Here, however, the relator seeks to avail himself of the processes of this court to expunge from the rolls as a qualified candidate for the Democratic nomination for Governor the name of a single respondent after it has already been established, by the decision in the Ayres case, that the 1954 election for Governor will be held. As a matter of mechanics, the action here sought to be compelled by the alternative writ is appropriate, for it is by the "nature of the thing to be done" that the propriety of issuing mandamus is to be determined. Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60; State ex rel. Fleming v. Crawford, 28 Fla. 441, 10 So. 118. And for the proposition that acts of expunging and cancellation may properly be commanded by mandamus see not only the Ayres case, supra, but Frankel v. Spainhour, 159 Fla. 416, 31 So.2d 535; State ex rel. Taylor v. Gray, 157 Fla. 229, 25 So.2d 492; State ex rel. Watson v. Gray, 153 Fla. 462, 14 So.2d 721; and State ex rel. Weathers v. Davis, 143 Fla. 250, 196 So. 487. But in the Ayres case the standing of the relator to sue was placed squarely upon the public importance of the question he raised, whereas the present relator's standing is subject to the gravest doubt. See Ex parte Levitt, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493; Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; Somlyo v. Schott, supra, 45 So.2d 502; State ex rel. Hanna v. Lee, 124 Fla. 588, 169 So. 220; Pennock v. State, 61 Fla. 383, 54 So. 1004; and State ex rel. Howarth v. Jordan, 105 Fla. 322, 140 So. 908. In the Ayres case, when the fact of the 1954 gubernatorial election was made dependent upon the decision of this court, the degree of public importance was increased by the prospect of *122 unnecessary official activity and expenditure of State funds if it were decided at a later time that no election should be held. In the present case however, where only one candidate is involved, a different situation is presented. What potential injury to the State can be shown here? The amount of additional activity and expense incident to placing another name on the ballot and otherwise accommodating the primary election machinery to one more candidate is de minimis.
Article III, Section 5 of the Constitution of Florida, alleged to bar this respondent from the consideration of the voters, prohibits a member of the affected class from being "appointed or elected" to the office concerned. Not by the broadest construction, to my mind, can this language be said to prevent a candidate from seeking nomination to office, and if the majority opinion in Davis ex rel. Taylor v. Crawford, 95 Fla. 438, 116 So. 41, must be interpreted to the contrary, I am to that extent in disagreement with it. The time-honored statement that the Democratic nomination is tantamount to election, cf. State ex rel. Watkins v. Fernandez, 106 Fla. 779, 143 So. 638, 640, 86 A.L.R. 240, can no longer be made with the confidence necessary to assure this court that it may take judicial notice thereof, and certainly there is and can be no guarantee that respondent Johns will be the Democratic nominee for Governor. Thus it appears that we are at least two major steps away from the point in time (i.e., the fact of being "elected") which is comprehended by the Constitutional provision sought to be invoked and it may come to pass that when we arrive at the proper juncture the question now presented to us with such urgency will have become moot. The remote, speculative character of the question affords too shaky a foundation for the relief desired.
Relator in effect contends that logically, although Article III, Section 5 uses the word "elected", it implies a prohibition so broad and sweeping that it reaches the entire process of public choice down to the incipient stage of candidacy for party nomination. But as Mr. Justice Holmes long ago observed, you cannot carry a Constitution out to "logical extremes", Paddell v. City of New York, 211 U.S. 446, 450, 29 S.Ct. 139, 53 L.Ed. 275.
I believe that the alternative writ should be quashed for failure on the part of relator at this time to make the showing of public importance necessary to maintain the action, since he has no direct interest in its outcome. In proceeding further, I am not unmindful of our pronouncements to the effect that a Constitutional interpretation will not be reached as a collateral matter, State ex rel. Jackson v. Gray, 125 Fla. 445, 170 So. 137; State ex rel. Crim v. Juvenal, supra, 159 So. 663, 664, but because the majority of the court has considered the merits I am moved to note that the underlying policy and purpose of Article III, Section 5 of the Florida Constitution are admirably expounded in the majority opinion and will not be further considered here beyond the observation that in my judgment the intention of the framers would not be effectuated by the issuance of the peremptory writ.
I am constrained to concur in the opinion prepared by Mr. Justice Drew. The so-called "Gomez" clause is not repugnant to, but on the contrary is entirely consonant with, the policy and purpose of Article III, Section 5 of the Florida Constitution. I cannot be persuaded to the view that the case of State ex rel. Fraser v. Gay, 158 Fla. 465, 28 So.2d 901, is distinguishable clearly or at all from the instant suit upon the merits. However, upon the question of the propriety of this court assuming original jurisdiction it is readily recognizable as distinct because when instituted the Fraser case undoubtedly presented a question of immediate public importance, and, even in the absence of such a showing, the relator therein had a direct personal interest which should have been sufficient to enable him to maintain the action. I would overrule and recede from the opinion in that case, insofar as it may be considered a precedent for the postulate that the "Gomez" clause is unconstitutional.
*123 With the growth of our institutions the field of public law has today become a complex science, and in applying its principles to new situations the danger of falling into error, always to be considered in the operation of fallible human agencies, is aggravated by the possibility of farreaching consequences. In a case such as this, where the question sought to be raised is whether or not a candidate for the highest office the State can bestow is to be barred at the outset from submitting his qualifications for the traditional and sovereign expression of the public forum, it is easy to sense the direction in which the greater danger lies.
For the above reasons I hold that the alternative writ should be quashed and the cause dismissed.
DREW, Justice (concurring specially).
In State ex rel. Fraser v. Gay, 158 Fla. 465, 28 So.2d 901, 903, after discussing the background of Section 5 of Article III of the Constitution of this State, this Court said:
"It therefore necessarily follows that the intent of Section 5 of Article III of the Constitution was to preclude members of the legislature from election to or appointment to any civil office that is created or the emoluments thereof increased during the time for which they are elected." (Emphasis added.)
I cannot agree that the purpose of Section 5 of Article III "was to preclude members of the legislature from election to or appointment to any civil office that is created or the emoluments thereof increased during the time for which they are elected." (Emphasis added.) I hold to the view that the purpose was to preclude members of the Legislature from using the sovereign power vested in them by the people for their enrichment or appointment or election to a self created office during their term of office. We have held that a raise in the emoluments of such civil office does not prevent a member of the Legislature which provided such increase from being elected to that office if the term for which he was elected does not begin until the day his term as a legislator ends. Davis ex rel. Taylor v. Crawford, 95 Fla. 438, 116 So. 41. See also State ex rel. West v. Gray, Fla., 70 So.2d 471. I can see no difference whatever in this situation and one where the law itself prevents self enrichment. The Constitution expressly recognizes the right of a member of the Legislature to be appointed or elected to such civil office during his term  unless during such term the emoluments thereof be increased or the office created. So the constitutional provision is not concerned with the use of his position to acquire a civil office.
Section 111.01(4), supra, accomplishes exactly what Section 5 of Article III was inserted in the Constitution to accomplish. It places self enrichment beyond the power of any member of the Legislature with reference to this matter, or, as is said in State ex rel. Hawthorne v. Wiseheart, 158 Fla. 267, 271, 28 So.2d 589, 592 (with reference to the constitutional provision), it precludes the power "to `featherbed' on the public domain". Such construction does not even remotely repeal or nullify the constitutional provision. On the contrary, such conclusion gives vitality and meaning and purpose to the words used and is consistent with other provisions of the same instrument.
Much has been said about overruling precedent. Neither this nor any other Court has ever hesitated to do so when necessary to accomplish true justice and uphold fundamental right or principles. I would recede from the holding in State ex rel. Fraser v. Gay, supra, and recognize the validity of Section 111.01(4), Florida Statutes 1953, F.S.A.
MATHEWS, Justice (dissenting to opinion, concurring to order).
This is an original mandamus proceeding to determine whether or not Senator Charley E. Johns, now Acting Governor of Florida, is eligible to be elected Governor *124 of the State of Florida for the balance of the unexpired term of the late Dan T. McCarty beginning on the first Tuesday after the first Monday in January 1955.
In re Advisory Opinion to Acting Governor Johns, Fla., Sept. 29, 1953, 67 So.2d 413, we held that Senator Johns was Acting Governor of the State of Florida by reason of the death of the late Dan T. McCarty, and in the case of State ex rel. Ayres v. Gray, Fla., 1953, 69 So.2d 187, we held that an election was required in November, 1954, to fill that part of the unexpired term of the late Dan T. McCarty, beginning on the first Tuesday after the first Monday in January, 1955.
In the General Election in November, 1952, Senator Johns was elected a member of the Senate for a term of four years ending in November, 1956, and his term as a State Senator will continue during that portion of the unexpired term of the late Dan T. McCarty from the first Tuesday after the first Monday in January, 1955, until November, 1956.
Section 5 of Article III of the State Constitution is as follows:
"No Senator or member of the House of Representatives shall during the time for which he was elected, be appointed, or elected to any civil office under the Constitution of this State that has been created, or the emoluments, whereof shall have been increased during such time."
On the 5th day of January, 1954, the State Budget Commission, acting upon a letter and request from Acting Governor Johns with reference to the salary of the Governor, adopted the following Resolution:
"It is hereby resolved that Item 22 of the Appropriation Act of 1953, being the appropriation for the Office of Governor, be adjusted and revised by a reduction of $3,000.00 per year in the amount therein appropriated for the salary of the Governor, so that the salary as adjusted and reduced, will be $12,000.00 per year, effective September 29, 1953, and irrevocably for the remainder of the current biennium."
The petitioner alleges that the General Appropriation Act for the year 1953, the same being Chapter 28115, increased the salary of the Governor from $12,000 to $15,000 per annum and that by reason of such increase in salary during the session of the Legislature for 1953, Senator Johns became ineligible to be elected to the office of Governor by reason of the provisions of Section 5, Article III of the Constitution of the State, and that the action of the Budget Commission in adopting the aforementioned Resolution was an unconstitutional delegation of legislative power and authority, and therefore did not remove the ineligibility of Senator Johns to be elected Governor of the State of Florida for the time specified.
In the motion to quash the alternative writ, filed by Senator Johns, he takes issue with the petitioner and raises the further question that the so-called "Gomez Clause", which is F.S. § 111.01(4), F.S.A., removes his ineligibility to be elected Governor even though the General Appropriation Act of 1953 increased the salary of the office of Governor. The so-called Gomez Clause was a part of Chapter 22913, Laws of Florida 1945, as amended by Chapter 24035, Laws of Florida 1947, and has been carried forward in each revision of the statutory law since its first appearance in Florida Statutes, notwithstanding the unanimous opinion of this Court in the case of State ex rel. Fraser v. Gay, 158 Fla. 465, 28 So.2d 901, 902. The so-called Gomez Clause reads as follows:
"`Any member of the legislature who may during the time for which he was elected senator or member of the house of representatives, be appointed or elected to a civil office referred to in sec. 5, article III, of the constitution, shall receive during the term for which he was elected or appointed to such civil office the salary or emoluments which under the provisions of law appertain *125 to such office at the beginning of the time for which he was elected senator or member of the house of representatives.'"
For us to say that the legal salary of the office of Governor is $12,000 or $15,000 per annum and say nothing more would leave unanswered fundamental questions of constitutional law which involve our entire system of constitutional government.
In considering the various questions presented, the Constitution as construed by former decisions of this Court is our guiding star. We should apply the provisions in the Constitution and the laws enacted pursuant thereto as we find them and not to satisfy some wish or desire of the moment. The Constitution should not mean one thing when applied to one man and another thing when applied to another man. The importance or the number of those affected should have no consideration in applying the Constitution. It may at times appear that some provision of the Constitution has served its useful purpose by reason of change in time and conditions, and if that be true then the Constitution should be amended in the manner and by the method provided for in the document itself. It should never be changed or amended by legislative fiat, executive usurpation or judicial interpretation. It has been suggested that Section 5, Article III of the Constitution, has served its useful purpose and that this Court should amend the Constitution by striking down such provision. The very suggestion is contrary and antagonistic to the whole plan of constitutional government. To follow such a suggestion it would be necessary for the members of this Court, composed of seven men, to exercise all of the power of a Constitutional Convention and of the people themselves in amending the organic law. It is a dangerous and revolutionary doctrine to advocate the amendment of the Constitution by any such method. State ex rel. West v. Butler, 70 Fla. 102, 69 So. 771.
The Resolution of the Budget Commission was based on the assumption that the Appropriation Act of 1953 raised the salary of the office of Governor from $12,000 to $15,000 per year and that Section 12 of the Appropriation Act delegated authority to the Budget Commission to reduce such salary in the manner attempted. The position of the respondent Johns that the so-called Gomez Clause removed his ineligibility to be elected to the office of Governor likewise assumes that the Appropriation Act raised the salary of the office of Governor, but that such raise does not apply to him because he can only receive $12,000 per year which was the salary of the office of Governor at the time he became a Senator.
In order to properly answer the questions it is necessary to determine, (1) the effect of the Resolution of the Budget Commission, (2) what effect, if any, the so-called Gomez Clause has upon the eligibility of the respondent, and (3) whether or not the salary of the office of Governor was actually increased by the Appropriation Act of 1953.
The action of the Budget Commission in adopting the above quoted Resolution was an absolute nullity in attempting to reduce the salary of the office of Governor of anyone else lawfully performing the duties of Governor.
The salary of the Governor was either increased or not increased by the Appropriation Act. If it was not increased, there is nothing to talk about. If it was increased, it remains increased until changed by the Legislature. The power to decrease such salary cannot be delegated to the Governor, the Budget Commission, or anyone else. However, the power delegated to the Budget Commission was to "adjust and/or reduce the budget of any department or board". The power was limited and did not attempt to include the power to reduce the salary of the Governor who is the chief member of the Executive Department of the government.
If Section 12 can be construed as authority to reduce the salaries of constitutional officers, then we are headed back to that form of tyranny and despotism which our constitutional system was designed to prevent. *126 Prior to the adoption of the Declaration of Independence and our constitutional system of government, it was recognized that when the power to make the law, the power to declare what the law is, and the power to execute the law were vested in one man or body of men, tyranny and despotism is the inevitable result. It was this kind of government which the Colonies rebelled against and declared their independence from. The various abuses of the King of England were set forth in the Declaration of Independence, and among them was the charge, "He has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries".
Section 29 of Article IV of the State Constitution definitely fixed the salary of the Governor. The last sentence of the Section provides that eight years after the adoption of the Constitution, the Legislature and it alone may increase or decrease the salary so fixed by the Constitution.
A subject may be legislative by reason of custom and usage or it may be solely within the province of the Legislature because of a constitutional declaration to that effect. In the present case in addition to custom and usage as shown by the history of our constitutional system, under Section 29, Article IV of the State Constitution, the power to increase or decrease the salary of the Governor was vested solely and exclusively in the Legislature.
In the case of Thomas v. State ex rel. Cobb, Fla., 58 So.2d 173, 178, the rule as stated in State ex rel. Murphy v. Barnes, 24 Fla. 29, 3 So. 433, was quoted:
"`* * * When a constitution directs how a thing shall be done, that is in effect a prohibition to its being done in any other way.'"
In the same opinion, the following illustration was given:
"For example, had there been absolutely nothing in the Constitution with reference to the payment of the salaries of county officers, the Legislature would have been all-powerful in respect to this subject; but when the Constitution made specific provisions with reference to this matter, it amounted in effect to a prohibition in the exercise of the power in any other way."
The statute involved attempted to authorize the State Board of Education to prescribe qualifications for county superintendents of public instruction, and this Court held:
"(2) The Legislature is prohibited from adding to or taking from the qualifications of the Superintendent of Public Instruction so as to make the same different from those prescribed in the Constitution.
* * * * * *
"(4) The Legislature, not having the power or authority to prescribe these additional qualifications for this office, had no authority to delegate to any board, or boards, the authority to prescribe additional qualifications".
The same principle of constitutional law and construction applies to "increasing or decreasing" the salary of the Governor as to prescribing qualifications as was attempted in Thomas v. State ex rel. Cobb, supra.
Thomas Jefferson was not a member of the Constitutional Convention of 1787, because he was in France representing his country. However, he wrote Madison to the effect that the most important thing to consider in framing the Constitution was that there should be three separate departments of government  legislative, judicial and executive  and that no department of government should perform any of the powers or duties properly belonging to the other.
We find in the Constitution that the advice of Jefferson was followed, and that three separate, distinct and independent departments of government were created.
After Jefferson returned from France, he was made Secretary of State by President Washington, and while holding this office, he was informed that Virginia was to *127 permit Kentucky to become a separate state, and that Kentucky was about to adopt a constitution. He immediately advised that the first safeguard to be put into the Kentucky Constitution should be to confine absolutely and exclusively to each one of the three departments of government, the powers belonging to it alone.
He wrote this section of the Kentucky Constitution, which became Article I, and sent it to the Convention. When the delegates learned who was the author of the article, history records that, "The respect of Kentucky for the great name of Jefferson carried it through, and it was at once adopted."
Today, every state constitution contains a provision similar to that of Kentucky, with reference to three independent departments of government.
James Madison, John Adams, Alexander Hamilton, and others were contemporaries of Jefferson, and took a vital part in the formation of the Union. It may be well to review briefly what some of these men thought of this fundamental idea of Jefferson.
In Volume I, No. 15 of the Federalist, page 353, Madison states that each department of government should be as little dependent as possible on the others. Continuing, Madison said "Neither of them ought to possess, directly or indirectly, any over-ruling influence in the administration of their respective powers. It will not be denied that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it."
During the same period, John Adams attempted to explain clearly to the people why they must keep the three branches of the government separate and distinct. It was his view that in order to establish, maintain and preserve a republic, it was necessary to eliminate arbitrary power and unchecked authority. He pointed out that any government in which one body, whether king or legislature, both makes the laws and executes them, is essentially an arbitrary government; on the other hand, it was the very essence of a free republic that no man, or set of men, should ever have power to make a law, to decide whether it had been violated, and to execute judgment on the violator.
George Washington's farewell address was the result of the combined thinking and authorship of Madison, Hamilton and Washington and probably others. They fully recognized the necessity of three departments of government and that no department should encroach upon the powers of either of the other departments. Washington said:
"It is important, likewise, that the habit of thinking in a free country should inspire caution, in those interested with its administration, to confine themselves within their respective constitutional spheres, avoiding in the exercise of the powers of one department to encroach upon another. The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism. A just estimate of the love of power, and proneness to abuse it, which predominates in the human heart, is sufficient to satisfy us of the truth of this position. The necessity of reciprocal checks in the exercise of political power, by dividing and distributing it into different depositories, and constituting each the Guardian of the Public Weal against invasion by the others, has been evinced by experiments, ancient and modern; Some of them in our country and under our own eyes. To preserve them is just as necessary as to institute them. If, in the opinion of the people, the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the constitution designates. But let there be no change by usurpation; for, though this, in one instance, may be the instrument of good, it is the customary weapon by which free governments are destroyed. The precedent must *128 always greatly over-balance in permanent evil any partial or transient benefit which the use may at any time yield."
In our plan of constitutional government as set forth in the Constitutions of the United States and of the State of Florida, the evil of having all departments of government exercised by one man or body of men was recognized and guarded against. These constitutions provided for three independent branches of the government.
Article II of the Constitution of the State of Florida is as follows:
"The powers of the government of the State of Florida, shall be divided into three departments; Legislative, Executive and Judicial; and no person properly belonging to one of the departments shall exercise any powers appertaining to either of the others, except in cases expressly provided for by this Constitution."
In and by Section 29 of Article IV, State Constitution, the question of the salary of the Governor was fixed by the Constitution until eight years after the adoption of that instrument and then the power to increase or decrease such salary of the office of Governor was committed absolutely and unconditionally to the Legislature and it alone.
The same is true with reference to the members of the Cabinet, the Supreme Court, Judges of the Circuit Courts, and State Attorneys. There would be no limit to what could happen should this Court approve the doctrine that the Legislature may abdicate its powers to fix salaries of constitutional officers and vest such power in the Executive branch of the government. If the members of the Cabinet refused to vote as requested by the Governor, or if the members of this Court, or the Circuit Courts, rendered opinions distasteful to the Executive, he would be empowered to inflict punishment in accordance with his wishes by reducing the salaries of such constitutional officers. Such a scheme is repugnant and abhorrent to our constitutional system of government and would utterly destroy that independence of the three departments of government, which is the guarantee of the people against tyranny and despotism.
It is urged that the salary of the Governor was increased to $15,000 per annum by the Appropriation Act but that now the salary has been decreased by the Budget Commission acting under the supposed authority vested in it by Section 12, Chapter 28115, Laws of Florida 1953.
This very thing was attempted in the case of State ex rel. Fraser v. Gay, supra. In the Fraser case the Legislature itself wrote into the law increasing the salary of the Comptroller the so-called "Gomez Clause". This was not an attempted delegation of power by the Legislature but was a direct attempt by the Legislature to exercise the power itself so as to make eligible any member of the Legislature appointed or elected to another civil office by limiting him to the salary existing at the time he was elected to the Legislature. After having been elected Comptroller, Fraser attempted to take office and claimed to be eligible by reason of the proviso and his willingness to abide by the same. In an exhaustive opinion written by Mr. Justice Terrell, concurred in by Justices Thomas, Buford, Chapman, Adams, Barns and Associate Justice Fabisinski, after reviewing the constitutional history concerning this matter and quoting at length from Story, Madison and Mason, it was said:
"Section 5 of Article III of the Constitution in words as clear as can be stated bars any member of the Senate or House of Representatives from election or appointment to certain civil offices during the time for which he was elected to the legislature and the office of Comptroller is, by reason of the salary raise in Chapter 22913 within the forbidden class. The terms of Section 5, Article III are so clear and direct that they defy misinterpretation. Any one who reads English can interpret them. To offer an interpretation other than their clear meaning *129 imports would be a distortion of the English sentence. The test of the validity of the quoted provisions of the acts is whether or not they hamper the operation of the constitutional mandate.
* * * * * *
"It therefore necessarily follows that the intent of Section 5, Article III of the Constitution was to preclude members of the legislature from election to or appointment to any civil office that is created or the emoluments thereof increased during the time for which they are elected. Chapter 22913 raised the salary of the Comptroller from $7,500 to $9,000 per year. Subsection (4) of Section 1 of this act attempts to overcome the constitutional prohibition by permitting the raise in salary during the period for which they are elected to the legislature. Section 7 of Chapter 22827, General Appropriation Bill for all salaries and expenses, is not materially different in result. It limits the salary of State officers to the amount appropriated in the act and then attempts to make members of the legislature eligible to election or appointment to them by remitting the increase in the same manner as Chapter 22913.

"* * * If this be true certainly it cannot avoid the constitutional prohibition by remitting the raise in salary for the period of this election to the legislature. A more conclusive reason is that if the assaulted provisions of the two acts are permitted to stand, Section 5 of Article III is circumvented and its practical purpose nullified." (Emphasis supplied.)
In the 1953 Appropriation Act the Legislature itself did not attempt to remit a a portion of the salary of the Governor but it is contended that in and by Section 12 of the Act, the Legislature attempted to delegate the authority to the Governor or to the Budget Commission. If the Legislature could not avoid the constitutional prohibition by remitting the raise in salary, how can it now be said that the Legislature can delegate such authority to the Governor or the Budget Commission. If Section 12 of the Appropriation Act can be so construed, then Section 5 of Article III "is circumvented and its practical purpose nullified".
The Legislature cannot delegate a power which it does not itself possess. Thomas v. State ex rel. Cobb, supra. If it be beyond the power of the Legislature to remit the increase, then the power to do so cannot be delegated to any board, commission or bureau or to the Governor himself.
The action of the Budget Commission in attempting to decrease such salary is an absolute nullity, and is an outstanding example that "power is of an encroaching nature".
The respondent insists that Section 5 of Article III of the State Constitution has served its usefulness and that the public welfare now requires that this Court should strike it down or that we should re-examine the so-called Gomez Clause and our opinion in the case of State ex rel. Fraser v. Gay, supra, and recede from that opinion or find and determine that the opinion in that case does not apply to the respondent.
It may be true that the provisions of Section 5, Article III of the State Constitution, as applied to elective offices has served its usefulness and that the Constitution should be amended by eliminating or repealing such section. If such be the case, then it should be repealed in the manner and by the method provided for in the Constitution itself and not by a majority of this Court, composed of seven men. This Court should refuse to arrogate to itself any such power.
It would be a revolutionary and dangerous doctrine for this Court to adopt a policy that it could by-pass the requirements about a constitutional convention or the requirements about submitting amendments by the Legislature to the vote of the people upon such proposed amendments. If we can repeal or amend one section of the Constitution by this method, then we can do away with all of the requirements of the Constitution about amendment or repeal and *130 proceed to determine that certain sections of the Bill of Rights or other sections of the Constitution no longer serve a useful purpose, in our opinion, and that the public welfare requires the repeal or amendment of such sections. By adopting such an expediency, the Constitution may be amended or revised in accordance with the will of the majority of this Court very speedily and economically and thereby save the time and expense of a constitutional convention or a proposal by the Legislature and a vote by the people. Such a procedure would nullify completely the requirements of the Constitution with reference to amendment or repeal, and substitute a government of men for our constitutional system of government under and regulated by law.
We have re-examined the opinion in the case of State ex rel. Fraser v. Gay, supra. It is true that it was stated in that opinion:
"We do not hold the challenged provisions of Chapters 22827 and 22913 to be bad ab initio. A set of circumstances might arise in which they could be upheld, but we find no reasonable basis to uphold either of them against the attack in this case." (Emphasis supplied.)
The above quoted isolated sentence was simply one sentence of a paragraph in a lengthy and well reasoned opinion. After having made the above statement the Court finished that paragraph as follows:
"The relator was a member of the Senate that raised the Comptroller's salary, his term does not expire till November 1948, so he is clearly within the class declared to be ineligible for election or appointment to another civil office by resigning from the legislature. If this be true certainly it cannot avoid the constitutional prohibition by remitting the raise in salary for the period of this election to the legislature. A more conclusive reason is that if the assaulted provisions of the two acts are permitted to stand, Section 5 of Article III is circumvented and its practical purpose nullified."
The main difference in the Fraser case and the case at bar is that in the Fraser case the name was Fraser, the office of Comptroller was involved. Fraser had been nominated by the State Democratic Executive Committee and elected in a general election where there was no other name on the ballot but where another name was written in as provided by law. The case happened in 1946. In the present case, the name is Johns, the office of Governor is involved, there will be a primary nomination instead of a nomination by a State Committee and the year is 1954.
If, as stated in the opinion in State ex rel. Fraser v. Gay, supra, the Gomez Clause is permitted to stand, Section 5, Article III of the Constitution is circumvented and its practical purpose nullified, then the same is true today. The opinion in the Fraser case was unanimous. If such was good law in 1946, it is good law in 1954. We do not recede from, or overrule, the opinion in that case.
We now come to the primary question involved in this litigation. Did Chapter 28115, being the General Appropriation Act of 1953, increase the salary of the Governor?
In compliance with Section 16, Article III, and Section 29 of Article IV of the State Constitution, F.S. § 111.01, F.S.A., which is a part of Chapter 22913, General Laws of 1945, as amended by Chapter 24035, Laws of 1947, increased the salary of the Governor to $12,000 per annum. This section was reenacted in 1953.
At the same session, that is, the 1953 Session, the Legislature enacted Chapter 28115, which is a General Appropriation Bill.
In Chapter 28115, General Laws of 1953, page 351, subsection 22, there appears the following:
"Governor  Office of
"a. Salaries  Including salary of $15,000 per annum for the Governor
* * * * * *
"Total of Item No. 22 .... $127,340.00"
*131 Section 30 of Article III of the State Constitution is a positive limitation upon the power of the Legislature when it provides:
"Laws making appropriations for the salaries of public officers and other current expenses of the State shall contain provisions on no other subject." (Emphasis supplied.)
This section must be read in connection with Section 16 of Article III of the State Constitution, which reads as follows:
"Each law enacted in the Legislature shall embrace but one subject and matter properly connected therewith, which subject shall be briefly expressed in the title, and no law shall be amended or revised (by reference) to its title only; but in such case the act as revised or section, or subsection of a section, or paragraph of a subsection of a section, as amended, shall be reenacted and published at length." As amended, election No. 7, 1950. (Emphasis supplied.)
This court has established in no uncertain terms the meaning, purpose and intent of the people in adopting Section 30 of Article III of the State Constitution with reference to the General Appropriations Act. Opinion of the Justices, 14 Fla. 283; Opinion of the Justices, 14 Fla. 285; Amos v. Moseley, 74 Fla. 555, 77 So. 619, L.R.A. 1918C, 482; and Lee v. Dowda, 155 Fla. 68, 19 So.2d 570, 571, in which this Court said:
"It is manifest that the Constitution considered this matter of appropriation laws so important that it required they should be freed from all log rolling, by putting into such bills riders dealing with any other subject whatsoever, so that the attention of the Legislature should be concentrated upon the wisdom of and the necessity for the several items of appropriations made by and enumerated in the bill, and so also that the public could rest assured that when an appropriation bill was up for consideration in the Legislature nothing would be considered but the appropriations, and that this important matter should not be prejudiced by the injection into the appropriation bill of any other matters, regardless of their inherent merits or demerits." (Emphasis supplied.)
In the case of Lee v. Dowda, supra, this Court quoted from Opinion of the Justices, 14 Fla. 285, as follows:
"`* * * Here we have a general provision denouncing the union in one law of two distinct subjects, and limiting the exercise of legislative power in the enactment of a law to the subject expressed in the title. With regard to the subject of appropriations the provision is specific, thus showing beyond question the intention of the framers of the Constitution to be to confine a law making appropriations for salaries, etc., to this one subject. And they were not content to leave the matter where it was placed by the general provision above mentioned. Laws making appropriations for the purposes mentioned shall contain provisions on no other subject. This is explicit. In the enforcement or construction of such law, the court cannot regard a provision embracing any other subject, for to do this they would themselves be disregarding their duty and become parties to a violation of the Constitution. And it matters not whether the subject of appropriations be the one embraced in the title or not. In discharging their duty a court must give effect only to the subject of appropriations, if that be the one embraced in the title, or if it is not, then it cannot give it operation, for in either case its joinder with another subject would be a violation of the Constitution. * * *" (Emphasis supplied.)
Section 30 of Article III of the State Constitution is more explicit and restraining about the general appropriation act than Section 16 of Article III with reference to titles and acts generally.
*132 The subject of fixing or increasing the salary of a constitutional officer is different from the subject of appropriations. The Court must give effect only to the subject of appropriations, for its "joinder with another subject (fixing or increasing salaries) would be a violation of the Constitution."
Section 29 of Article IV of the State Constitution fixed the salary of the Governor at $3,500 per annum, and made the same a continuing constitutional appropriation. This section then provided "That the Legislature may after eight years from the adoption of this constitution increase or decrease any or all of said salaries." (Emphasis supplied.) Therefore, under this section the salary of the Governor was fixed at the definite sum of $3,500 per annum for a period of eight years, and eight years after the adoption of the constitution, the Legislature and it alone was given the power to "increase or decrease" the salary.
When the Legislature acted from time to time under the authority granted to it and "increased or decreased" the salary of the governor, such salary became a substitution for the salary of $3,500 per annum, and became a constitutional continuing appropriation for the amount so fixed by the Legislature.
In re Advisory Opinion to Governor Sholtz, 114 Fla. 520, 154 So. 154, this Court said:
"The effect of section 3 of article 16 is to make disbursable by way of a constitutional appropriation out of any available moneys in the state treasury in the general state funds, the amounts of salaries fixed by law for state officers to receive, which salaries, after being so fixed by statute, then become payable monthly upon the officers' requisition as provided in section 3 of article 16 of the Constitution of Florida.
"Our opinion is that section 3 of article 16 of the Constitution authorizes you to countersign warrants based upon the requisitions of circuit judges, state attorneys, and official court reporters for their respective salaries for the month of April, 1934, as fixed by chapter 15859, irrespective of what is set forth or contained in chapter 15858, Acts of 1933." (General Appropriation Act.) (Emphasis supplied.)
See also In re Opinion of the Justices, 145 Fla. 375, 199 So. 350, and State ex rel. Williams v. Lee, 121 Fla. 815, 164 So. 536.
The Florida rule is well established in other states of the Union, with Constitutions similar to ours, that when an office is created by the Constitution and a salary is provided for, whether by the Constitution or by an act of the Legislature authorized by the Constitution, the salary so fixed is a continuing constitutional appropriation. In the case of Riley v. Carter, 165 Okla. 262, 25 P.2d 666, 678, 88 A.L.R. 1018, it was held:
"From these two sections it is seen that the Constitution fixes, until changed by the Legislature, the salary of the justices of this court, and provides that they shall receive same. Pursuant to the authority granted by the Constitution, the Legislature changed the salaries of the justices of this court by chapter 273, Sess.Laws 1929, p. 396, fixing the salary at $7,500 per year payable monthly, and in now considering the words in the Constitution we are to read the same as if the salary fixed by the Constitution was the sum of $7,500 per year payable monthly, for the authorized acts of the Legislature as much express the will of the people as their expression as contained in the Constitution.
* * * * * *
"* * * We further hold that, this being an appropriation made by the people in the Constitution, it constitutes a continuing appropriation, and that the limitation contained in section 55, art. 5, of our Constitution, is not applicable to appropriations made in the Constitution itself." (Emphasis supplied.)
In that case opinions from other courts throughout the United States are cited and *133 quoted from and the annotation in 88 A.L.R. 1054 fully supports the Florida rule as stated in re Advisory Opinion to Governor Sholtz, 114 Fla. 520, 154 So. 154.
The salary of the governor is set forth in two sections of Florida Statutes. F.S. § 14.04, F.S.A. states that "The salary of the Governor of this State shall be twelve thousand dollars." The source of authority is then given, as Amended Laws 1943, chapter 22000, Sec. 7; Laws 1945, chapter 22913, Sec. 1.
Section F.S. § 111.01, F.S.A., reads in part as follows:
"Salaries of certain state administrative officers
"(1) Beginning July 1, 1945, the annual salaries of the governor and cabinet officers shall be the amount set opposite the title of such officers, to wit:
"Governor ............ $12,000.00
* * * * * *
"(3) All of the salaries provided for in this section shall be paid in equal monthly installments on warrants to be issued by the comptroller."
Section 29 of Article IV of the State Constitution provides for an "increase or decrease" in the salary of the governor. The two sections above mentioned, that is, F.S. §§ 14.04 and 111.01, F.S.A., were enacted by the Legislature and increased the salary of the Governor pursuant to said Section 29 of Article IV. It is, therefore, obvious that construing Section 29 of Article IV of the State Constitution in connection with F.S. §§ 14.04 and 111.01, F.S.A., the Legislature raised the salary of the Governor and fixed it at $12,000 per annum which is a continuing constitutional appropriation.
In 1890 this Court in an opinion in the case of State ex rel. Mitchell v. Bloxham, 26 Fla. 407, 7 So. 873, held that where the constitution prescribes the salary of an officer, and the Legislature enacts a law appropriating an amount large enough to permit his being paid more, the statute is not legal authority for paying more than the salary prescribed by the Constitution.
The above principle was re-affirmed in two advisory opinions to the Governor. One is Advisory Opinion to the Governor, April 14, 1934, 114 Fla. 520, 154 So. 154, which related to the salaries of Circuit Judges. This opinion was written by the late Chief Justice Davis and was concurred in by Justices Whitfield, Terrell, Brown and Buford.
The other was In re Opinion of the Justices, 145 Fla. 375, 199 So. 350 (December 20, 1940), and related to the salary of a Justice of the Supreme Court. This opinion was written by Mr. Justice Terrell and concurred in by Justices Whitfield, Brown, Buford, Chapman and Thomas.
In the first opinion relating to the salaries of Circuit Judges, the General Appropriation Act did not provide sufficient money to pay the salaries of the Circuit Judges as fixed by law. After discussing the question at length, the opinion held: (1) that the salaries of Circuit Judges had been fixed by law, and that they were continuing constitutional appropriations, (2) that such payment from the general fund of the salaries so fixed by law would prevail over the amount appropriated in the General Appropriation Act, and (3) that Section 3 of Article XVI authorized the payment of the salaries of these constitutional officers as fixed by law "irrespective of the amount named or specified in the general appropriation act", and then said:
"Under section 3 of article 16 it is provided that the salary of each officer shall be payable monthly upon his own requisition. Circuit judges and state attorneys are constitutional officers. Section 8 of article 5; section 15, article 5. Court reporters are of statutory creation. Chapter 11976, Acts of 1927, section 4872, C.G.L. The salaries of circuit judges, state attorneys, and of official court reporters have been fixed by law. Chapter 15859, Acts of 1933.
* * * * * *

*134 "Our opinion is that where an office exists under the law, and an occupant thereof has been duly appointed and qualified and has performed the duties of the office for a particular monthly period for which he claims compensation payable under a statute specifically fixing the amount of salary to which such officer shall be entitled to be paid when and after he has performed the constitutional or statutory duties of the office for the period for which compensation is claimed, that section 3 of article 16 providing that the salary of each officer shall be payable monthly upon his own requisition authorizes the payment of the salary of the officer as fixed by law, irrespective of the amount named or specified in the general appropriation act of the Legislature." (Emphasis supplied.)
If the salary of a constitutional officer cannot be "decreased" by the general appropriation act, it is difficult to understand any process of reasoning by which we can say that such salary can be "increased" by the general appropriation act. The same sentence of Section 29 of Article IV of the State Constitution which authorizes an "increase" in the Governor's salary also authorizes a "decrease" in such salary. If the salary cannot be "decreased" by the general appropriation act, then, certainly, it cannot be "increased."
In the other advisory opinion relating to the salary of a Justice of the Supreme Court, it was stated [145 Fla. 375, 199 So. 352]:
"* * * You say that the budget and appropriation for the Supreme Court is not sufficient to pay the salary of Honorable Alto Adams or his secretary, no such accounts having been in contemplation when the General Appropriation Bill was passed.
* * * * * *
"You are advised that Chapter 19262, Acts of 1939, fixes the salary of Justices of the Supreme Court at $7,500 per year and makes a continuing appropriation from any funds in the State Treasury not otherwise appropriated, for their payment. The salary of Honorable Alto Adams should be paid under authority of this act and you would be authorized to countersign any warrant for that purpose." (Emphasis supplied.)
It is insisted that the two advisory opinions to the Governor are nothing more than the private opinion of each Justice to the Governor and are not binding upon anyone. The Advisory Opinion to the Governor in 114 Fla. 520, 154 So. 154, with reference to constitutional officers has been made more than a mere advisory opinion amounting to nothing except for its persuasive character by the later case of State ex rel. Williams v. Lee, 1935, 121 Fla. 815, 164 So. 536, 538, in an opinion by Mr. Justice Buford, concurred in by Justices Ellis, Terrell, Whitfield, Brown and Davis. The Advisory Opinion above mentioned was made a part of the opinion, which was an adversary proceeding. After stating the facts to be that the relator, John W. Williams, claimed $300 per month as the salary fixed by law, and that the Appropriation Bill had not provided sufficient money to pay his salary in full, the Advisory Opinion to the Governor, 114 Fla. 520, 154 So. 154, was quoted in full by the Court and then was adopted, ratified and approved in the following language:
"While advisory opinions do not necessarily control in litigated cases, they have a persuasive value, and we think the rule as stated in that opinion is applicable to the case at bar, * * *."
We thus have a unanimous opinion in a case adopting the language of an Advisory Opinion as being the controlling law in this State.
We should bear in mind that there is a vast difference between fixing or increasing the salary of a constitutional officer and appropriating money to pay the salary so fixed or as increased. This distinction was recognized in the case of State ex rel. Hudson v. Carter, 167 Okla. 32, 27 P.2d 617, *135 621, 91 A.L.R. 1497, wherein the Supreme Court of Oklahoma held:
"* * * no appropriation shall be made in the general appropriation bill for any officer or employee, regular or special, of the executive, legislative, or judicial departments of the state, unless provision shall have been made for such employment and the amount of salary therefor fixed, by law, prior to the enactment of the general appropriation bill, * * *." (Emphasis supplied.)
We need not go outside the provisions of the Constitution of the State of Florida, the statutes duly enacted pursuant thereto and the opinions of this Court for a correct answer to the question under consideration.
However, the case of Hailey v. Huston, 25 Idaho 165, 136 P. 212, 214, so thoroughly covers every question with reference to this matter, we quote at length from that opinion:
"Section 15 of article 3 of the Constitution provides, among other things, that no law shall be passed except by bill. Section 16 provides that every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; and section 18 provides that no act shall be revised or amended by mere reference to its title, but the section as amended shall be set forth and published at full length. The subject of the increase of any salary is not expressed in the title of the appropriation act, and, as that subject is not expressed in the title of the act, an increase of salary cannot be included in such act. And if it were included in the title to said act, the act would be obnoxious to the Constitution under another provision of section 16, which declares that every act shall embrace but one subject and matters properly connected therewith. A general appropriation act includes one subject, and an increase in the salary of an officer is another and distinct subject, and, being two separate and distinct subjects they are prohibited from being combined in one act by the provisions of said section. Under the provisions of said section 18, when a section of the statute is amended, it must be set forth and published at length, and, as the said salary statute (section 851, Rev. Codes) was not set forth and published at full length, it was not amended by said general appropriation act. Here we have a specific statute fixing said salary, and it was not contemplated by the framers of the Constitution that such a statute should be amended in any other manner than by specific enactment as provided by the Constitution. It certainly was not contemplated that an amendment to a salary statute could be tucked away in a general appropriation bill, and no reference made to it in the title of the bill. The title to said appropriation bill would not give to any member of the Legislature or to any other person any inkling of a purpose to increase a salary. That section of the Constitution which provides that every act shall embrace but one subject and matters properly connected therewith, and that such subject shall be expressed in the title, was for the purpose of giving the members of the Legislature, as well as citizens generally, notice of the purpose and object of the bill, and provides for titles to all bills, as well as for a unity of title and subject-matter. Said appropriation in the general appropriation bill would not and could not amend the statute fixing the salary of the officer referred to.

"By making said appropriation, the Legislature evidently desired to increase the salary of said officer, and this court is of the opinion that said desire was a laudable one, and recognizes that under present conditions it would be only fair and right to increase the salary of said officer to the full amount of said appropriation intended for such purpose; but the court cannot disregard the provisions of the Constitution in regard to the enactment and amendment of laws, and is compelled to hold that the appropriation *136 made by the Legislature for said office does not increase the salary of said officer nor suspend or amend the provisions of said section 851, Rev.Codes, as amended, fixing said salary." (Emphasis supplied.)
See also annotations in 16 L.R.A.,N.S., 631; 27 L.R.A.,N.S., 537; 49 L.R.A.,N.S., 67; and 164 A.L.R. 928.
The cases of State ex rel. Williams v. Lee, 140 Fla. 380, 191 So. 697, and State ex rel. Knott v. Lee, 144 Fla. 164, 197 So. 681, are cited as authority and precedent for the contention that the salary of the Governor, a constitutional officer may be increased in the general appropriation act. We will hereafter refer to these cases as the "Williams case" and the "Knott case". The facts with reference to each of these cases are entirely different from the facts in the case now before us. In the Williams case the Justices pointed out that Williams was an employee. In the Knott case, Mr. Knott was a constitutional officer. Otherwise, the cases were similar.
In the Williams case and the Knott case the opinions cited Section 11(a) of the General Appropriation Act of 1939, same being Chapter 19280, as the predominant reason for holding that the amount named in the appropriation act prevailed over the statute. The Court said [140 Fla. 380, 191 So. 698]:
"Section 11(a) of the General Appropriation Bill of 1939 (Chapter 19280, Acts of 1939) is as follows: `Where the salary of any officer or employee of the State has not been changed by any Act out of the Legislature of 1939, the appropriation for salaries respecting such officer or employee shall control the salary or compensation to be paid such officer or employee.'
"This provision evidences a clear intent on the part of the Legislature to pay all officers or employees of the State government during the biennium beginning July 1, 1939, such amounts for salary as is carried for them in the General Appropriation Bill regardless of any other act fixing their compensation.

"In view of the foregoing provision, any act fixing the compensation of State officers and employees, including Relator, different from the amount shown to have been provided for them by Chapter 19280, Acts of 1939, is suspended during the life of the latter act. * * *" (Emphasis supplied.)
There is no such provision in the Appropriation Act of 1953 as Section 11(a) of the Appropriation Act of 1939.
In the Williams and Knott cases, in addition to citing Section 11(a) of the Appropriation Act of 1939 as the predominant reason for the holding in those cases, some importance was placed upon the fact that the Budget Commission had recommended the increase in salary for Mr. Knott and the Appropriation Act was in effect the adoption of the recommendation of the Budget Commission. The budget submitted to the Legislature by the Commission is nothing more than a recommendation and at every session the members of the Legislature engage in the pleasant pastime of seeing how many recommendations they will refuse to adopt. Experience has shown that the Legislature is jealous of the authority vested in it and fully recognizes that the ultimate power and authority to fix salaries for constitutional officers and appropriate the money necessary to pay such salaries is vested in the Legislature and it alone. This power cannot be delegated. It would be a plain violation of the Constitution for the Legislature to delegate to a board, composed of constitutional officers, the power to fix their own salaries.
In the Knott case the Court said [144 Fla. 164, 197 So. 681]:
"The question here turns on the interpretation of the recommendation of the Budget Commission for the 1939-1940 biennium as affected by that part of Section 11(a) of Chapter 19280, Acts of 1939, as follows:

*137 "`* * * Where the salary of any officer or employee of the State has not been changed by any Act out of the Legislature of 1939, the appropriation for salaries respecting such officer or employee shall control the salary or compensation to be paid such officer or employee.'
* * * * * *
"The Appropriations Committee accepted the recommendation of the Budget Commission and placed the full amount recommended by the latter in the General Appropriation Bill, Chapter 19280, Acts of 1939, to operate the expenses of the State Treasury. The bill was passed carrying this amount. A bill was also introduced fixing the State Treasurer's salary at $6,000 per year, but realizing that it would likely not be reached for consideration, during the closing hours of the session as shown by the journals the provision from Section 11(a) as here quoted was added as an amendment to the General Appropriation Bill. Every member of the legislature was advised of the amendment and voted for or against the bill with that knowledge.
"* * * The Budget Commission recommended the raise, the legislature approved and put it in the appropriation bill, and Section 11(a) allocated it to the State Treasurer as his yearly salary."
At the last session of the Legislature the Budget Commission did not recommend any increase in the salary of the Governor. In the Report to the Legislature of the Budget Commission of the State of Florida for the Biennium, July 1, 1953 to June 30, 1955, page 38, we find the following:

 "Detail of Salaries
 Position First year
 Governor $12,000.00"

The facts in the Williams case and the Knott case are entirely different from facts in the present situation, and would not for that reason be stare decisis as to this matter.
It is suggested that Section 4(5) of Chapter 28231, Acts of 1953, F.S.A. § 216.171(5) is authority that the amount appropriated in the General Appropriation Act shall control over specific statutes fixing the salary of the Governor, a constitutional officer. This Section 4(5) reads as follows.
"Where a sum is mentioned in the general appropriations act for the salary of a state officer or employee such amount shall control over prior statutes fixing such salary except those enacted at the same session of the legislature as the appropriations act."
Chapter 28231, Acts of 1953, has absolutely nothing to do with the fixing or prescribing of salaries or appropriating money with which to pay the salary of the Governor, a constitutional officer. The title of that Act is with reference to the disposition of funds received as fees, tuitions and other charges by institutions under the management of the State Board of Control and certain regulatory boards, but contains no reference whatsoever to fixing the salaries of the Governor or to making any provision that appropriations for salaries in the appropriation act should prevail over the salaries of constitutional officers as fixed by the Legislature.
Where an Act is susceptible of two interpretations, one of which is constitutional and the other is unconstitutional, it is the duty of the Court to adopt that construction which will preserve the constitutionality of the act. The law with reference to the question of a constitutional officer appears to be firmly established in this state. When the salary of a constitutional officer has been increased or decreased or fixed in the manner and method provided for in the Constitution, and the General Appropriation Act carries a salary different from that fixed by a law enacted for the purpose of fixing such salary, the amount named in the law fixing the salary shall *138 prevail over the amount named in the Appropriation Act. This was the law established in the cases of State ex rel. Mitchell v. Bloxham, 26 Fla. 407, 7 So. 873; advisory Opinion to Governor Sholtz, 114 Fla. 520, 154 So. 154; In re Opinion of the Justices, 145 Fla. 375, 199 So. 350; State ex rel. Williams v. Lee, 121 Fla. 815, 164 So. 536. This law was also approved and re-affirmed in an opinion by Mr. Justice Terrell in the case of State ex rel. Williams v. Lee, 140 Fla. 380, 191 So. 697, 698, when it said:
"This Court has held that where a State officer's salary is fixed by statute, he is entitled to payment therefor on his own requisition to the extent of the salary fixed by law irrespective of the amount specified therefor in the General Appropriation Act of the Legislature. In re Advisory Opinion to Governor Sholtz, 114 Fla. 520, 154 So. 154; see, also, In re Advisory Opinion to the Governor, 74 Fla. 250, 77 So. 102."
After having re-affirmed the law, the opinion then gave as a reason for upholding the salary of Williams, an employee, appropriated in the General Appropriation Act, the provision that where the salary had not been changed by any act of the Legislature, the "Appropriation for salaries respecting such officer or employee shall control the salary or compensation to be paid such officer or employee".
As heretofore stated, in the Knott case the Court did not mention or overrule any of its previous decisions but again gave as a reason for upholding the General Appropriation Bill the proviso contained therein: "Where the salary of any officer or employee of the State has not been changed by any Act out of the Legislature of 1939, the appropriation for salaries respecting such officer or employee shall control the salary or compensation to be paid such officer or employee."
It, therefore, appears that whether or not a constitutional officer is entitled to the amount named in the appropriation act, which is different from the amount named in a law enacted for the purpose of fixing a salary, would depend upon some further action by the Legislature, either by amending the law fixing the salary or by some section being included as that cited in the Williams and Knott cases.
Until the Williams and Knott cases this Court was committed to the doctrine that where the salary of a constitutional officer was fixed by the Constitution and the Legislature was authorized to increase or decrease such salary, when the Legislature changed the amount from that fixed in the Constitution, the new amount named and fixed became a substituted constitutional salary and was a continuing constitutional appropriation for the amount named. It was further committed to the doctrine that if the sum named in the appropriation act was different from that named in the law fixing a salary of a constitutional officer, the amount named in the Act fixing salaries would prevail irrespective of the amount named in the appropriation act. Such was the unanimous holding in Re Advisory Opinion to the Governor, 114 Fla. 520, 154 So. 154; In re Opinion of the Justices, 145 Fla. 375, 199 So. 350; State ex rel. Williams v. Lee, 121 Fla. 815, 164 So. 536, and these cases were before the Legislature when it enacted the Appropriation Act of 1939. In construing that Appropriation Act the opinion made an exception to the rule which existed prior to the addition of Section 11(a). Whether right or wrong, the Court decided in the Williams and Knott cases that the Legislature in the appropriation act could change the salary of a constitutional officer as fixed by law, provided it did something further and that was to provide that where there was a difference in the salary fixed by some other law and the Appropriation Act that the amount named in the Appropriation Act should prevail.
It is urged that Section 11(a) was not necessary and meant nothing. This can hardly be true because when the Appropriation *139 Act contained no provision similar to Section 11(a), this Court repeatedly held that the amount of salary named in a salary law would prevail over the amount named in the General Appropriation Act. It was to get around such holding by this Court that Section 11(a) was inserted and some such provision has been in every appropriation act since 1939 through 1951. There is no such provision in the Appropriation Act of 1953.
The unanimous holding of this Court has been that all provisions of an Act by the Legislature are presumed to have some useful purpose. There is no presumption that the Legislature inserts a clause or paragraph in an Act which is useless. Stein v. Biscayne Kennel Club, 145 Fla. 306, 199 So. 364; Amos v. Mathews, 99 Fla. 1, 126 So. 308; Girard Trust Co. v. Tampashores Development Co., 95 Fla. 1010, 117 So. 786; Alexander v. Booth, Fla., 56 So.2d 716; 50 Am.Jur. 361, Statutes, Secs. 358, 359. The opinions in the Williams and Knott cases gave to Section 11(a) a certain and definite meaning and purpose.
There is nothing in Section 1, Item 22 of the Appropriation Act of 1953 to indicate or suggest that the purpose was to do anything more than make appropriations. There is no clause or paragraph in the General Appropriation Act of 1953 which provides that where the salary of any officer has not been changed by any Act out of the Legislature of 1953 the appropriation for salaries respecting such officer shall control the salary or compensation of such officer.
Subsection (1) of Section 10 of the Act, Appropriation Act of 1953, F.S.A. § 215.40(1), provides that any unexpended balance not dispensed in the appropriation or appropriated for administrative and other expenses, shall automatically revert to the fund from which appropriated and shall be available for re-appropriation.
Section 12 of the Act reads in part as follows:
"Section 12. All appropriations provided for by this Act are maximum appropriations, * * *."
Section 18 of the Act reads in part as follows:
"Section 18. Any sum or sums appropriated for salaries, if not required for such purposes, may be applied to expenses of the department to which they are appropriated by approval of the Budget Commission, * * *."
It is clear that the maximum appropriation of $15,000 per year is a maximum appropriation which, if required, can be paid from the appropriation bill for the salary of the Governor. Even had F.S. § 111.01, F.S.A. been amended to increase the salary of the Governor to $25,000, only $15,000 could have been paid from the appropriation bill and the balance of $10,000 should have been paid from the General Fund as a constitutional continuing appropriation as was done with reference to Circuit Judges, In re Advisory Opinion to Governor Sholtz, 114 Fla. 520, 154 So. 154. On the other hand, had there been only $6,000 appropriated for the Governor in the appropriation bill, such would not have amended F.S. § 111.01, F.S.A., or decreased the salary of the Governor. There would have been a deficit of $9,000 to be paid as a "constitutional continuing appropriation" from the General Revenue Fund, in order to pay a legal salary of $15,000.
The net result is that the appropriation for salary of the Governor is a maximum appropriation and the maximum cannot be paid unless the salary of the Governor is "increased" in some manner and method by the Legislature to that maximum. This was not done and the salary remains at $12,000 per annum. We therefore have an excess appropriation for salary of the office of Governor of $3,000 per annum which is not required for the purpose of paying such salary of $12,000, and such $3,000 should be disposed of as provided for in Section 10 or Section 18 of the Act.
*140 This construction is consistent with the Constitution and the excess appropriation cannot and does not authorize the Comptroller to draw his warrant, or the Governor to countersign such warrant, or the Treasurer to pay a warrant for such excess appropriation for salary of the Governor when the appropriation is more than is necessary to pay the salary as fixed by law.
Emoluments include salary. Section 29, Article IV of the State Constitution fixes the salary at $3500 per annum, and vests in the Legislature the power to increase the salary without limit as to amount or time except as to future action by the Legislature. Salary is compensation incident to the office. The Governor is prohibited by this section from receiving any additional compensation beyond his salary for any services rendered or to be rendered in connection with the interest of the State.
Section 5 of Article III prohibits a member of the Legislature being appointed or elected to any civil office that has been created or the emoluments whereof shall have been increased during the time he was elected to the Legislature. It makes no difference whether the emolument, the salary, or compensation is increased ten dollars or ten thousand dollars, or that there is no "personal" or "self interest"  the Constitution places no limitation except an increase in emoluments.
There is no guarantee that any law is a fixed or permanent law so long as it may be amended, modified, changed or repealed every two years.
The Constitution makes no distinctions as to the time the increase in salary must remain in order to make ineligible the election of a member of the Legislature except it must be effective for a portion of the time during his term as a member of the Legislature for the other office to which he is appointed or elected.
To say that the emoluments of the office of Governor have not been increased within the spirit and intent of Section 5 of Article III of the State Constitution but has been increased for all other purposes is to do violence to the English language and in effect repeal the plain and unambiguous language contained in the Constitution. When applied to a candidate for Governor, it is not an increase, but when applied to someone else, it will buy grits and bacon.
It should, therefore, be held that (1) even if the salary of the Governor had been increased to $15,000 per year, the action of the Budget Commission in passing the Resolution, dated January 5, 1954, is an absolute nullity and did not reduce or change the salary of the office of Governor, (2) that Section 5, Article III of the State Constitution as construed by this Court in the case of State ex rel. Fraser v. Gay, supra, is controlling in this case, and that the so-called Gomez Clause has no effect upon the eligibility of the respondent to be elected Governor of the State of Florida, and to hold that such clause is effective would circumvent Section 5, Article III of the State Constitution, and make "its practical purpose nullified", and (3) that the salary of the office of Governor was increased and fixed by the Legislature of the State of Florida as authorized by Section 29, Article IV of the State Constitution, by F.S. § 111.01, F.S.A., at $12,000 per annum, and such salary was not increased by the Legislature by the enactment of the General Appropriation Act of 1953, and such salary remains fixed and established at $12,000 per annum.
For the reasons stated the alternative writ should be quashed and the cause dismissed.
TERRELL, Justice (dissenting).
I think Chapter 28115, Acts of 1953 raised the salary of the Governor from $12,000 to $15,000 per annum. This matter was, in my opinion, settled in the cases of State ex rel. Williams v. Lee, 121 Fla. 815, 164 So. 536, State ex rel. Williams v. Lee, 140 Fla. 380, 191 So. 697, and State ex rel. Knott v. Lee, 144 Fla. 164, 197 So. 681. For a period of more than thirteen years, *141 and seven sessions of the legislature the people and the law-makers have relied upon these rulings. Section 5, Article III of the Constitution, provides that "No Senator or member of the House of Representatives shall during the time for which he was elected, be appointed, or elected to any civil office under the Constitution of this State that has been created, or the emoluments, whereof shall have been increased during such time." Senator Johns was a member of the Senate that enacted Chapter 28115, his term does not expire until November, 1956; he was, in my judgment within the ban of the Constitution. I think that in State ex rel. Fraser v. Gay, 158 Fla. 465, 28 So.2d 901, the matter of disqualification in these circumstances was completely settled by this Court and that granting the motion to quash would amount to receding from that unanimous decision. We are dealing with a constitutional provision that the people made. This Court is without power to repeal or set it aside. Only the people who made it can do that.
Therefore, I am convinced the motion to quash should be denied.
THOMAS, J., concurs.